**FEDERAL SAVINGS AND LOAN INSURANCE CORP., et al.,**
**Plaintiffs,**

v.

**Robert W. QUINN, et al., Defendants.**

**No. 89 CV 98.**

United States District Court,
N.D. Ohio, E.D.

April 14, 1989.

Harry D. Cornett, Arter & Hadden, Cleveland, Ohio, for plaintiffs (Stephen Kessler, Trial Atty., Office of Gen. Counsel, Federal Home Loan Bank Bd., Washington, D.C., of counsel).

Nancy A. Shaw, Spieth, Bell, McCurdy & Newell, Cleveland, Ohio, and James D. Friedman, Quarles & Brady, Milwaukee, Wis., for defendants.

## ORDER

SAM H. BELL, District Judge.

Plaintiffs Federal Savings and Loan Insurance Corporation (FSLIC) and Cardinal Federal Savings Bank (Cardinal) filed the complaint in this case on January 18, 1989, seeking declaratory judgment, preliminary and permanent injunctive relief and damages from defendants Robert W. Quinn and Daniel J. Gannon, former Cardinal employees. FSLIC is authorized to sue under, and bases jurisdiction on, Title 12 of the United States Code, sections 1725(c) and 1730(k)(1). *See FSLIC v. Ticktin*, — U.S. ——, 109 S.Ct. 1626, 104 L.Ed.2d 73 (1989), *reversing*, 832 F.2d 1438 (7th Cir.1987). Savings deposits at Cardinal are insured by FSLIC,

and FSLIC has regulatory jurisdiction and authority over Cardinal.

Plaintiffs filed a motion for temporary restraining order with their complaint. The parties came before the court but ultimately entered an agreement holding the status quo until a preliminary injunction motion could be heard. Substantial discovery took place during the interim and answers and counterclaims were filed by the defendants. The motion for preliminary injunction was heard over a three-day period, February 21–23, 1989. The parties agreed to file post-hearing briefs and were directed to address three issues: (1) FSLIC's standing to bring this motion; (2) the effect of a separate contract between Cardinal and Society National Bank (Society) which has been fully executed and which yielded the funds sought to be recovered in this lawsuit; and (3) the merits of the preliminary injunction motion. Post-hearing briefs have been filed and considered. The court's findings of fact and conclusions of law on the motion for preliminary injunction follows. But first, a brief summary of the pleadings filed in this case is in order.

### I.

### The Pleadings

The complaint's allegations arise from the employment relationship which existed between Cardinal and defendants Quinn and Gannon. Quinn served as Chief Executive Officer of Cardinal and Gannon as President and Chief Operating Officer from November 24, 1987 until December 30, 1988. Each was a member of Cardinal's board of directors.

Quinn and Gannon entered one-year employment contracts commencing December 1, 1987, and which, for the most part, are similar. The contracts provided for automatic renewal for one-year terms absent timely notice to the contrary. Quinn's annual salary was set at $210,000.00, and Gannon's was $200,000.00. Cardinal agreed to secure an irrevocable letter of credit as security for certain specifically enumerated obligations under each contract. On July 21, 1988, Cardinal did in

fact secure from Society separate letters of credit for Quinn, in the amount of $440,-000.00 and Gannon, in the amount of $410,-000.00.

On December 17, 1987, the Federal Home Loan Bank Board (FHLBB), as operating head of FSLIC, entered into a consent agreement with the board of directors of Cardinal; both Quinn and Gannon were signatories. Among the supervisory powers and authority over Cardinal granted to the FHLBB was approval of all employment contracts and renewals. Although the FHLBB approved the employment contracts of Quinn and Gannon, it did not approve the renewal of those agreements. FHLBB contends that absent such approval, the employment contracts could not be renewed and the contract renewal relied on by Quinn and Gannon constituted a violation of the consent agreement and a breach of their fiduciary obligations.

On December 30, 1988, Cardinal was acquired by First Nationwide Financial Services, Inc. (First Nationwide) through a FSLIC-assisted transaction pursuant to section 406(f) of the National Housing Act. Section 2.8(d) of Quinn and Gannon's employment contract provides that in the event of a FSLIC-assisted takeover, all obligations under the contract would be terminated. By resolution, dated December 30, 1988, the FHLBB terminated all employment contracts of Cardinal. Quinn and Gannon then made demand upon Society for payment under the letter of credit. Society in turn notified Cardinal of its intention to honor those demands.

Plaintiffs contend that the defendants are not entitled to payment under the letters of credit because their employment contracts were approved without FHLBB consent in violation of section 16(o) of the consent agreement and/or all obligations of Cardinal were terminated pursuant to section 2.8(d) of their employment contracts upon a FSLIC-assisted takeover.

Plaintiffs seek a declaratory judgment in their first claim stating that: (1) the Quinn and Gannon contracts were improperly renewed in violation of the consent agreement for failure to obtain FHLBB approval

and (2) that even if they were renewed in some manner, they were terminated by operation of section 2.8 of the employment contracts which was called into effect on December 30, 1988, when the FSLIC-assisted takeover occurred. Further, they seek a declaration that Cardinal has no further monetary obligation to them and that any money distributed under the letters of credit should be returned to Cardinal.

In their second claim, plaintiffs allege that the defendants breached their fiduciary and statutory duties by failing to seek FHLBB approval for renewal of their employment contracts and renewal of the letters of credit. Plaintiffs' third claim is this: defendants are not entitled to the funds contained in the letters of credit, and they would be committing a conversion of Cardinal property if it is distributed to them. Once distributed, a loss will be created to Cardinal for which FSLIC will be required to make reimbursement. They seek an injunction to prevent this conversion. In their fourth claim, plaintiffs seek an accounting, constructive trust and order of restitution of any funds distributed under the letters of credit. Finally, they seek a temporary restraining order, preliminary and permanent injunction in their fifth claim related to the funds held under the letters of credit.

Both Quinn and Gannon have filed answers to the complaint. In addition, each has advanced multifaceted counterclaims.

## II.

### Motion for Temporary Restraining Order

The parties were before the court on FSLIC's motion for temporary restraining order on January 19, 1989. Society was represented at that proceeding even though not a named party.

Before the matter was formally heard, however, the parties entered an agreement which effectively maintained the status quo. Specifically, all parties agreed that the defendants' demands under the letters of credit held by Society could be honored but that the funds, once received by the defendants, were to be maintained locally

pending the outcome of the court's consideration of the motion for preliminary injunction. The defendants were prohibited from using the principal amount. Neither FSLIC nor Cardinal have any lien against the proceeds of either letter of credit.

### III.

### Motion for Preliminary Injunction

#### A. Findings of Fact

1. In August, 1986, Robert W. Quinn began employment with Chicago West Pullman (CWP), a holding company owned by two individuals which invests in undervalued companies in need of capital and management. CWP originally invested primarily in railroads but in 1986 decided to consider opportunities in the thrift industry. Quinn, who has a background in finance and experience in the thrift industry, was hired to identify thrifts for CWP to acquire.

2. In keeping with its customary practice in other similar circumstances, CWP issued a letter of intent in December, 1986 regarding the possible acquisition of Cardinal. Quinn went to Cardinal as CWP's representative in the acquisition. He had an office at Cardinal and went there on a day-to-day basis. The accounting firm of Arthur Anderson & Co. was hired to assist in the due diligence review of Cardinal's assets.

3. As of December, 1986, and continuing until its acquisition by First Nationwide, Cardinal was a federal savings and loan association chartered under the authority of the FHLBB. It was a mutual institution owned by its depositors.

4. FSLIC first noted problems at Cardinal in late 1983 or early 1984 through examiner reports. Gerald P. Summers, Vice President of the Federal Home Loan Bank of Cincinnati (Bank of Cincinnati) and Director of the Department of Supervision, had a number of meetings with Cardinal's management and board of directors. In time, it became clear that management was not operating prudently and losses were likely. The focus of FSLIC in 1986 was on ensuring that Cardinal made no more imprudent loans. At that time, FSLIC was not considering further assistance for Cardinal.

5. On March 5, 1987, a meeting was scheduled to review the early findings of the due diligence review by Arthur Anderson & Co. Representatives from Cardinal and CWP (including Quinn) as well as FSLIC agents employed by the Cincinnati Bank attended. Quinn and CWP expressed concern that Cardinal's financial condition was even worse than they had previously thought.

6. From March through October, 1987, Quinn became more involved in Cardinal's operations and was sought out by Summers to assist Cardinal in a number of way concerning problems ranging from recommending personnel to liason with CWP.

7. In August, 1987, Korn/Ferry, an executive search firm, contacted defendant Gannon in relation to the position of chief operating officer at Cardinal. Gannon was then serving as president and chief executive officer of Marine National Exchange Bank in Milwaukee, Wisconsin, where he had been employed for ten years. Gannon came to Cleveland in September, 1987 to meet with Robert Seaton, the then chief executive officer, and Quinn. Quinn, who had not previously known Gannon, was impressed with his qualifications and' took him to Cincinnati in early November to meet with Summers. When the meeting concluded, Summers directed Quinn to negotiate the terms of Gannon's employment contract. Deposition of Robert J. Booth at 25.

8. Summers realized by Fall of 1987 that management would have to be changed in order to correct some of the problems at Cardinal. However, FSLIC's supervision extended only to Cardinal's loans at that time. Although it placed examiners at board meetings where loans were approved and kept close supervision, it could not seek formal removal without more evidence. Informal methods were used, however, and eventually the chief executive officer and the general counsel agreed to step down and begin a search for a successor.

9. In early November, 1987, the FSLIC supervisory agents at Cincinnati Bank received the Significant Supervisory Case Report regarding Cardinal which indicated that there were significantly more problem assets than previously known. They were further advised that an unassisted resolution of the case within six or twelve months was unlikely. In an assisted transaction, FSLIC would negotiate with an acquirer and agree to provide financial assistance as part of the acquisition so that the institution would be financially healthy.

10. In November, 1987, Summers spoke to Quinn concerning assuming the chief executive officer position at Cardinal. Quinn expressed interest in the position and, thereafter, Summers discussed with Quinn the terms of employment of both Quinn and Gannon.

11. In a meeting on November 17, 1987, the Cincinnati Bank agents confirmed that Cardinal was insolvent. They began negotiating the terms of a consent agreement with Cardinal's board of directors. Quinn and Gannon were aware of this matter while they were negotiating their employment contracts knew they would be bound by a consent agreement and fully intended to comply with it once hired by Cardinal and to cooperate with the Cincinnati Bank.

12. Additionally, on the 17th, Cardinal formally offered employment to Quinn and Gannon. Salary was agreed upon; other benefits were discussed. Both of the new officers expressed a desire to be indemnified for any and all acts and financial losses caused by the previous management. They discussed, in addition, a number of matters incident to employment including bonuses, insurance and the use of automobiles. But of import to each was his desire to be secured in certain employment benefits, a desire heightened by Cardinal's financial condition and the possibilities of what might follow because of that condition. Letters of credit were suggested as a form of protection. FSLIC did not disapprove the incentive package although the amount and criteria of bonuses and the value of the letters of credit were left open.

13. Negotiations concerning contracts continued. In late November the parties agreed in principle and the terms of their oral agreements were put to paper and forwarded to Cincinnati for review. Both Quinn and Gannon began employment for Cardinal on November 24, 1987, each having severed his previous employment ties and each anticipating the possibility of CWP's acquisition of Cardinal inasmuch as each stood to profit handsomely if such an occurrence took place.

16. On December 17, 1987, the board of directors at Cardinal entered a consent agreement with FSLIC based on Cardinal's insolvency. Paragraph 16(*o*) of that agreement provides in pertinent part:

16. Except for existing legally binding commitments ... the Institution, *without prior written approval of the Agent,* shall not, ...:

. . . . .

(*o*) enter into, renew or revise any contractual arrangement with any officer, director, controlling person, affiliate, subsidiary or attorney or agent for or of the Institution or any of its subsidiaries;

Plaintiff's Exhibit 37 (emphasis in original).

17. Quinn had submitted a proposed amendment to this paragraph on behalf of Cardinal's board adding to subparagraph (*o*) words excluding the employment contracts of Quinn and Gannon. Plaintiff's Exhibit 29. Summers declined this proposal, however, as he wanted no exceptions. Furthermore, at the time there were no formal employment contracts although the Cincinnati Bank had acquiesced in their employment. Supervisory Agent Michael L. Doebereiner responded to the board of directors by letter dated December 15, 1987, with a counterproposal indicating that some of the amendments were unacceptable. Plaintiff's Exhibit 35. The specific language Quinn asked to be included in paragraph 16(*o*) was *omitted* in the counterproposal.

18. After Summers wrote to the Cardinal board of directors on January 7, 1987 indicating that Cincinnati Bank approved of retaining the services of Quinn and Gannon and that they would not be held accounta-

ble for decisions of former management, the board of directors drafted revised employment contracts which were formally approved and signed on February 10, 1988. Defendants' Exhibits 9 and 10 (letters dated January 7, 1988). The contracts were then forwarded to the Cincinnati Bank for approval as required by paragraph 16(*o*) of the consent agreement.

19. The next communication from the Cincinnati Bank regarding the employment contracts was a letter to the Cardinal board of directors dated April 13, 1988, and signed by supervisory agent Kurt A. Kreinbring. Defendants' Exhibit 14. The letter advised that certain revisions were required before final review of the contracts by the Cincinnati Bank. The first amendment required was to shorten the notice period for termination in section 1.1 from one hundred twenty days to sixty. Section 1.1 provides for a term of employment of one year commencing on December 1, 1987, and for continuing successive twelve month periods absent notice of termination (without cause) by any party one hundred and twenty days prior to the anniversary date. Plaintiff's Exhibits 1 and 4. Kreinbring next objected to Quinn and Gannon having any employment or consulting association with CWP while under contract with Cardinal. Thus, amendment of section 1.2 of their contracts was required to remove Cardinal's approval of such activities. Other pertinent amendments required included revision of the indemnification agreement and a reduction of the amount of the letters of credit for Quinn and Gannon from the computation of three times their base salary. Further, Kreinbring indicated that the incentive compensation provision was excessive and should be deleted as their office did not believe bonuses were appropriate.

20. Quinn, surprised by this approach, called Summers who agreed to review the matter. On April 21, 1988, Summers wrote to Quinn and Gannon stating that he had reviewed their proposed employment contracts and agreed with Kreinbring's assessment. Defendant's Exhibit 16. Summers wrote in part that, "It is my opinion that the negotiated salaries and collateralization

of the severance payments were and continue to be fair to both of you. You will recall that the collateralization authorization was a concession on our part." *Id.* Summers agreed that the payment of bonuses "at this juncture is clearly inappropriate," but the matter would be reviewed at year-end in light of the condition of Cardinal then. *Id.* Summers wrote Quinn and Gannon again on May 5, 1988 assuring them that the areas discussed in Kreinbring's letter were their only concerns. Specifically, the Cincinnati Bank questioned the amount of fees Cardinal was generating in the contracts and invited Quinn and Gannon to contact Summers as soon as possible to resolve their differences. Defendant's Exhibit 17.

21. Quinn and Gannon submitted numerous amendments to their contract for the Cincinnati Bank to review between May and July of 1988. *See* Plaintiff's Exhibits 1 and 4, tabs 10, 11, 12, 13. Summers never approved a bonus provision. On July 14, 1988, however, Summers wrote to the board of directors that most of the Cincinnati Bank's concerns about the employment contracts had been resolved. *Id.* at tab 14. The bonus issue was left open for consideration upon submission of a proposal at the end of the year by the board of directors. The provision for notice of termination had been reduced in the amendments to ninety days and the amount to be collateralized under the letters of credit was reduced to twice their salaries which was apparently acceptable to the Cincinnati Bank. Summers added: "[t]he approval of the agreements as amended, with the exception of incentive bonuses, shall in no way effect the enforceability of section 2.8 of Messrs. Quinn and Gannon's agreement." *Id.* Section 2.8 deals with termination or suspension of the agreement upon the occurrence of certain events. Pertinent to this case are sections 2.8(d) and (e), which provide:

2.8 *Termination or Suspension as Required By Law*

Notwithstanding anything in this Agreement to the contrary, the following provisions shall limit the obligations of Employer, to the extent required by the

applicable regulations of the Federal Savings and Loan Insurance Corporation (12 C.F.R. 563.39), or similar succeeding regulations:

(d) All obligations under this Agreement shall be terminated, except to the extent determined that continuation of this Agreement is necessary for the continued operation of Employer, (i) by the FSLIC, at the time the FSLIC enters into an agreement to provide assistance to or on behalf of Employer under the authority contained in Section 406(f) of the National Housing Act; or (ii) by the Federal Home Loan Bank Board, at the time the Board or its Principal Supervisory Agent approves a supervisory merger to resolve problems related to operation of Employer or when Employer is determined by the Board to be in an unsafe or unsound condition.

(e) Termination or suspension pursuant to subparagraphs (a), (b), (c) and (d) hereunder, shall not affect rights hereunder which are vested at the time of such termination.

Plaintiff's Exhibits 1 and 4. This language is required by FHLBB regulation. 12 C.F.R. § 563.39(b)(5).

22. Section 4.1 of the employment agreements provided for collateralization of Cardinal's specific obligations under sections 2.1(b), 2.2, 2.3, 2.5 and 2.6(a). Each of these provisions entitle the executive to certain compensation and are based on the following events: if the employer elects to terminate the executive at the end of any term, section 2.1(b); termination upon death of the executive, section 2.2; termination for total and permanent disability, section 2.3; termination by the employer without cause or termination by the executive for cause, section 2.5; and termination by the executive due to change in control, section 2.6(a). If the executive quit voluntarily without cause, section 2.4, or was terminated for cause, section 2.4, he would not be entitled to make demand under the letter of credit. Section 2.4 is not included as an obligation under section 4.1 for which the employer must provide collateralization. Likewise, there is no mention in section 4.1 of section 2.8.

23. Both Quinn and Gannon understood Summers' July 14, 1988 letter to represent formal supervisory approval under the consent agreement of their employment contracts except for the criteria for payment of bonuses. But, they believed the bonuses had been agreed to in principle.

24. On July 21, 1988, Cardinal opened letters of credit at Society for Quinn, in the amount of $420,000, and Gannon, in the amount of $400,000, secured by Cardinal-owned treasury notes. Plaintiff's Exhibits 1 and 4, Tab B. The expiration date was November 24, 1988. The Cardinal board of directors took this action clearly relying upon Summers July 14, 1988 letter of approval of the two employment contracts. Defendants' Exhibit 24. The Cardinal board approved payment of an annual fee to Society for the letters of credit in November, 1988. As neither Cardinal nor Society had given notice of termination, the letters of credit were automatically extended until November 24, 1989. *See* Plaintiff's Exhibits 76, 81, 82, 83. The Cardinal board of directors did not seek approval from the Cincinnati Bank for the extension of the letters of credit.

25. There is no dispute that management under Quinn and Gannon was significantly better and that Cardinal, although still suffering losses, was in a much better financial position by the end of 1988 and recapitalized sufficiently for it to be ready for acquisition. Clearly, the events leading to the need for Cardinal to enter a consent agreement with FSLIC were not the fault of Quinn and Gannon. Deposition of Robert J. Booth at 32.

26. No notice of termination of the employment contracts was given by any party ninety days before their December 1, 1988, anniversary date. According to section 1.1 of the contracts, absent timely notice of termination, the contracts would automatically renew for another twelve-month period. The Cardinal board of directors did not seek approval of the contract renewals from the Cincinnati Bank. Quinn and Gannon discussed the matter of approval under the consent agreement with Cardinal's at-

torney, Steven A. Lenn, and felt comfortable that such approval was not required.

27. In December, 1988, the Cardinal board of directors sought Cincinnati Bank approval for salary increases for its employees and bonuses for some managers. Summers responded in a letter dated December 21, 1988, that the request could not be approved at that time but would be reconsidered after the fourth quarter financial statements were received. Defendants' Exhibit 39. Consideration of bonus approval was also deferred pending formulation of appropriate criteria but as to Quinn and Gannon, Summers related that bonuses may not be paid at this time. *Id.*

28. CWP did not succeed in its attempt to acquire Cardinal. In fact, on December 30, 1988, First Nationwide acquired all assets and liabilities of Cardinal with FSLIC assistance. *See* Plaintiffs' Exhibit 111, Assistance Agreement. Cardinal was acquired by First Nationwide in conjunction with three other troubled thrifts as a package. Deposition of Robert Linderman at 31. A conservator was appointed on the same date. Defendants' Exhibit 41. Quinn, informed on that date that First Nationwide representatives would come to Cardinal to speak to the staff met with the conservator and twelve First Nationwide representatives. Carolyn MacKenzie, executive vice president of First Nationwide, was the spokesperson. She assured the staff that the changeover would be fluid and non-threatening. She then met with Quinn and advised him that both his services would no longer be required and that his contract was null and void. Gannon was given the same notice as to his contract that evening by MacKenzie. It is standard practice for First Nationwide to install its own senior officers in an acquisition. Deposition of Robert Linderman at 50; Deposition of Charles McCauley at 17–18. There was some discussion of severance benefits at that time but Quinn and Gannon were informed that any offer had expired for lack of timely acceptance by letter dated February 10, 1989. Defendants' Exhibits 146, 147. They had never received any written offer of severance, however, although one was requested for their consideration. Deposition of Charles McCauley at 27, 29.

29. Quinn and Gannon were not paid any severance benefits under their employment contracts with Cardinal after their termination.

30. In early January, Gannon's attorney wrote to Summers to ascertain what the terms of Gannon's separation from Cardinal would be. Summers responded on January 11, 1989, that the Cincinnati Bank would not recommend that First Nationwide pay the amounts requested. Plaintiffs' Exhibit 115. This letter advised that the FSLIC-assisted acquisition by First Nationwide terminated the contract pursuant to section 2.8(d) of the employment agreement but also indicated that paragraph 16(*o*) of the consent agreement had been violated for failure to seek FSLIC approval for the renewal of the employment contracts.

31. Robert Ramos, Jr., the new president and chief operating officer of Cardinal instructed Society on January 12 and 13, 1989, to terminate the letters of credit it held in favor of Quinn and Gannon in accordance with instructions from the Cincinnati Bank. Plaintiff's Exhibits 116, 117; Deposition of Michael Doebereiner at 94.

32. Quinn spoke to Cincinnati Bank representatives the first week in January and set up a meeting in Cincinnati for January 13th in order to discuss opportunities for him with other troubled thrift institutions. This prospect was positively received by Cincinnati Bank agents. Deposition of Robert J. Booth at 203. There was no mention at that meeting of any violation of the consent agreement. Upon Quinn's return to Cleveland, he returned a call from Summers who expressed concern that Quinn and Gannon were going to draw down their letters of credit. In a telephone conversation on January 18th, Summers took the position that the letters of credit could be drawn upon only in the event of an unassisted takeover.

33. On January 17, 1989, Quinn and Gannon submitted drafts to Society on the letters of credit established by Cardinal

pursuant to their employment contracts. Before disbursing any monies, Albert O. Schupp, Senior Vice President and Manager of Society, informed Cardinal by letter dated January 17, 1989, that it would not recognize Cardinal's attempt to unilaterally terminate the outstanding letters of credit. Plaintiffs' Exhibit 118. Furthermore, he advised that demand had been made in accordance with the terms of the letters of credit and that he anticipated that they would honor the demands. He requested payment of the aggregate amounts by Cardinal. *Id.* The treasury notes held as collateral, however, were cashed shortly thereafter.

34. FSLIC may have some responsibility to reimburse Cardinal for the loss of assets caused by the sale of the treasury notes. *See* Deposition of Roger Jeffrey Lerner, Defendant's Exhibit D–165 at 74–78; Plaintiff's Exhibit 120 at 7–17. This responsibility, if any, arises from the provisions of the assistance agreement between FSLIC and First Nationwide, Cardinal entered on December 30, 1988. Plaintiff's Exhibit 111. Testimony of Douglas Reidel.

35. Quinn and Gannon continue to seek employment but are hindered by the pendency of this lawsuit. They would accept suitable employment outside the state, however, and relocate all of their assets. Gannon is contemplating the purchase of a small business.

### B. Conclusions of law

#### 1. Standing

Defendants have challenged the court's jurisdiction to consider the motion for preliminary injunction on the basis that FSLIC lacks standing to assert it and Cardinal is not party to the motion. FSLIC responds that it meets the standing requirements.

Pursuant to the Constitution, federal courts are courts of limited jurisdiction. Art. III, § 2, cl. 1; *Allen v. Wright,* 468 U.S. 737, 750–52, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). Parties attempting to invoke federal court jurisdiction must allege an actual case or controversy which has been defined through several doctrines, but most notably through the standing doc-

trine. *Allen v. Wright,* 468 U.S. at 750, 104 S.Ct. at 3324; *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed. 2d 343 (1975); *Flast v. Cohen,* 392 U.S. 83, 94–101, 88 S.Ct. 1942, 1949–53, 20 L.Ed.2d 947 (1968).

■ There are two components of analysis under the standing doctrine, the constitutional and the prudential. *Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976). The first requires a litigant to demonstrate "injury in fact." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982). Three elements must be shown to satisfy the injury-in-fact requirement:

(1) an actual or threatened injury suffered by plaintiff as a result of defendant's putatively illegal conduct, *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 [99 S.Ct. 1601, 1607, 60 L.Ed.2d 66] (1979);

(2) the injury must be fairly traceable to the challenged action, *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41 [96 S.Ct. 1917, 1925, 48 L.Ed.2d 450] (1976); and

(3) relief from the injury must be possible through the judicial process, *Allen v. Wright,* 468 U.S. at 751 [104 S.Ct. at 3323]; *Flast v. Cohen,* 392 U.S. 83, 97 [88 S.Ct. 1942, 1951, 20 L.Ed.2d 947] (1968).

Application of these elements cannot be mechanical but requires a careful examination of the allegations made to determine whether a particular plaintiff is entitled to the court's resolution of the particular claims asserted. *Allen v. Wright,* 468 U.S. at 751–52, 104 S.Ct. at 3323–25.

The second component of the standing doctrine arises from limitations imposed by "judicial self-governance." *Warth v. Seldin,* 422 U.S. at 500, 95 S.Ct. at 2206. Foremost among these limitations is the requirement that a party must assert his own legal rights and not the rights of a third party. *Id.* at 499, 95 S.Ct. at 2205;

*Planned Parenthood Ass'n v. City of Cincinnati,* 822 F.2d 1390, 1394 (6th Cir.1987).

Defendants contend that FSLIC does not have standing in this case under either component of analysis. The parties agree that the terms of the assistance agreement between FSLIC and First Nationwide define FSLIC's obligations on this question. FSLIC interprets the assistance agreement to require it to reimburse Cardinal for the amounts paid to Quinn and Gannon under the letters of credit. Defendants, on the other hand, argue that the language of the provisions FSLIC relies on does not impose such an obligation. In addition, defendants argue that if there is a duty to reimburse, FSLIC is asserting the rights of a third party which infringes the prudential limitation on the standing doctrine.

Two routes exist in the assistance agreement which FSLIC argues will lead to its obligation to reimburse First Nationwide. Section 3 requires First Nationwide to establish a special reserve account which may be debited for several items, two of which are "Capital Losses on Covered Assets," § 3(a)(1), and "Indemnifications" § 3(a)(2). Covered assets are defined in section 1(L)(1) and (2) in pertinent part, as follows:

> (1) *"Covered Asset"*: The term "Covered Asset" means the following:
>
> > (1) Except as provided in § 1(L)(1)(B), all assets except intangible assets and:
>
> > .     .     .     .     .
>
> > (2) All securities issued by either the United States Department of the Treasury or any governmental agency of the United States of America with maturities in excess of six months from the Effective Date and any other securities, including mortgage-backed securities, which are not pledged or otherwise encumbered, shall be deemed to the Covered Assets for purposes of debiting the Special Reserve Account for Covered Asset Losses pursuant to § 3(a)(1), but shall not be deemed to be Covered Assets for the purpose of debiting the Special Reserve Account for Guaranteed Yield Amount pursuant to § 3(a)(7).

FSLIC maintains that the treasury notes used as collateral for the letters of credit which were cashed are covered assets for which it will be responsible to Cardinal for reimbursement for their loss. Defendants argue that inasmuch as the treasury notes were "pledged or otherwise encumbered" as collateral for the letters of credit, they are not "covered assets" under this provision. FSLIC concedes that the treasury notes were pledged but argues that section 1(L)(2) *excludes* treasury notes with maturity dates in excess of six months which are not pledged or encumbered.

This provision is one of inclusion, however. It includes treasury notes with maturity dates in excess of six months which are not pledged. As the treasury notes were pledged, they cannot be considered covered assets under section 1(L)(2).

■ The other basis for reimbursement FSLIC points to in the assistance agreement is section 7 which provides for indemnification for unreserved-for claims. This section provides, in pertinent part:

> § 7 *Indemnifications and Pursuit of Related Claims.*
>
> (a) *Indemnifications.* To the extent not otherwise reimbursed or reimbursable, the CORPORATION will indemnify the ACQUIRER and an ACQUIRING ASSOCIATION for, and pay as provided in § 6(a), the After–Tax Amount of (i) the amounts actually incurred and paid by the ACQUIRER or an ACQUIRING ASSOCIATION in connection with the satisfaction, settlement or compromise of the following Claims and challenges to the Transaction, and (ii) the reasonable costs and expenses of litigation related to such Claims and to the defense of such challenges to the Transaction, including reasonable attorneys' and accountants' fees, travel expenses, court costs and related litigation expenses, and such other actual and reasonable costs as may be actually incurred and paid by the ACQUIRER or an ACQUIRING ASSOCIATION in connection with such satisfaction, settlement, or compromise, *provided* that before such costs and expenses may be debited to the Special Reserve Account,

the ACQUIRER and an ACQUIRING ASSOCIATION shall comply in all material respects with the covenants set forth in [this Agreement] and submit to the CORPORATION in a form reasonably satisfactory to the CORPORATION the reports and submissions required ... this Agreement pertaining to the item for which indemnity is sought, and *provided further,* that such costs and expenses shall be subject to approval by the CORPORATION as being related to matters subject to indemnification under this § 7(a):

> (1) *Unreserved for Claims.* Any Claim against an ACQUIRED ASSOCIATION, an ACQUIRING ASSOCIATION as successor to an ACQUIRED ASSOCIATION, or the ACQUIRER based upon an action or failure to act of an ACQUIRED ASSOCIATION prior to the Effective Date, ... to the extent that such Claim (A) was not adequately reserved for or provision made for its payment on the Books and Records, and (B) is not fully reimbursable under any insurance policy, bond, or other provision for funding.

Douglas L. Reidel, Senior Vice President of Finance for Cardinal at the present time and Chief Financial Officer prior to its acquisition by First Nationwide, testified that there was never a specific reserve established for the letters of credit. *See* Plaintiff's Exhibit 119. Disbursement of the treasury notes will create a loss on Cardinal's books according to Reidel.

As there are no reserves for these notes, if the amounts are not recovered they are for claims under the assistance agreement which will be debited to the Special Reserve Account pursuant to section 3(a)(2) and subject to reimbursement by FSLIC under section 7(a)(1). FSLIC has established its standing to proceed on the motion by showing this injury which is both actual and threatened which occurred as a result of defendants' conduct in drawing down the letters of credit and which is possible to relieve through the judicial process. Thus, FSLIC has established standing in the constitutional sense.

The prudential component of standing requires that FSLIC assert its own legal rights and not those of a third party. It is clear that FSLIC is seeking to avoid its obligation of indemnification under the assistance agreement and, in doing so, is protecting its own rights in this action.

2. Preliminary Injunction Factors

Under the applicable precedent from the Sixth Circuit, four factors must be considered in determining whether a preliminary injunction should be granted. These four factors are:

1. Whether the plaintiff has shown a strong or substantial likelihood or probability of success on the merits;

2. Whether the plaintiff has shown irreparable injury;

3. Whether the issuance of a preliminary injunction would cause substantial harm to others; and

4. Whether the public interest would be served by issuing a preliminary injunction.

*Mason County Medical Association v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977); *accord, Gaston Drugs, Inc. v. Metropolitan Life Insurance Co.,* 823 F.2d 984, 988 (6th Cir.1987); *Christian Schmidt Brewing v. G. Heileman Brewing,* 753 F.2d 1354, 1356 (6th Cir.1985); *Tate v. Frey,* 735 F.2d 986, 990 (6th Cir.1985); *Friendship Materials, Inc. v. Michigan,* 679 F.2d 100, 102 (6th Cir.1982). These factors are not to be rigidly required but rather, balanced according to their relative strengths. *In re Delorean,* 755 F.2d 1223, 1229 (6th Cir. 1985); *Frisch's Restaurant, Inc. v. Shoney's, Inc.,* 759 F.2d 1261, 1263 (6th Cir. 1985).

a. *Likelihood of Success on the Merits*

■ This first legal point to be resolved is the affect on this litigation of the independent contracts between Society and Cardinal for the letters of credit. Pursuant to section 4.1 of the defendants' employment agreements, Cardinal agreed to open letters of credit with a federally insured commercial bank which were capable of being drawn by the defendants as beneficiaries upon presentment of a sight draft and cer-

tificate of beneficiary, an example of which is attached to the contracts as Exhibit C. *See* Plaintiff's Exhibits 1 and 4, Tab A, Exhibit C. The letters of credit opened by Cardinal at Society required that this exact documentation be presented. *Id.* at Tab. B. Defendants made proper demand as beneficiaries of this contract between Society and Cardinal, and Society paid according to its obligation.

In this court's view, that contract is fully executed and not the object of the present dispute between the employer and the defendants regarding their entitlement to the proceeds under their employment contracts. The dispute between Cardinal and the defendants does not affect the independent obligation of Society to pay upon proper presentment under its contract with Society. *See In re Compton Corp.*, 831 F.2d 586, 590 (5th Cir.1987); O.R.C. § 1305.05 (Page's 1979). Thus, Society properly paid under the letters of credit and the proceeds, the object of this dispute, are properly in the hands of the beneficiaries. *See Itek Corp. v. First National Bank of Boston*, 730 F.2d 19, 24 (1st Cir.1984).

It is also important to note that Society has never been a party to this proceeding. Plaintiffs originally sought injunctive relief to prevent the defendants from drawing on the letters of credit and once paid, to prevent the defendants from dissipating the principal amount. Therefore, the focus has always been on the dispute originating from the underlying employment contracts and not the letters of credit themselves.

FSLIC approaches the employment contractual dispute from two directions. First, FSLIC argues that the defendants breached their fiduciary duty by not seeking approval of the renewal of their contracts pursuant to paragraph 16(*o*) of the consent agreement. Although the failure to seek FSLIC approval of the renewal may have been a breach of the consent agreement, the remedy for that breach is not necessarily the avoidance of the independent employment contracts between Cardinal and the defendants. In addition, the contracts were approved by FSLIC on July 14, 1988, after a great deal of negotiation

and after the defendants had been performing in anticipation of those contracts since the previous November. FSLIC knew the contracts had an automatic renewal provision unless negative notice was given by either parties ninety days before December 1, 1987. Indeed, the time for notice was a significant point of negotiation. At the time FSLIC gave the contracts final approval on July 14, 1988, the time for notice under the contract was only forty-five days away. FSLIC conducted business with Quinn and relied on the management expertise of both Quinn and Gannon at all times after it approved the contract. Given this conduct and FSLIC's approval of the contract so close to the time provided in the contract to give negative notice, FSLIC cannot complain that paragraph 16(*o*) was violated by Cardinal's failure to seek FSLIC approval of the renewal of the contracts so as to prevent that renewal. Whether the defendants breached their fiduciary duty in failing to seek FSLIC approval of their renewal is a question not yet before the court.

■ The second direction FSLIC takes in seeking injunctive relief is that defendants are not entitled to the collateralized benefits under the terms of their employment contracts. Section 4.1 provides for Cardinal's obligation to establish letters of credit and refers to the following sections of the contract from which that obligation arises: sections 2.1(b), 2.2, 2.3, 2.5 and 2.6a. Each of these sections, except section 2.2 relating to termination for death of the executive, provides that when triggered by the occurrence of certain events benefits will be paid representing an aggregate of: an amount equal to 100% of their base salary, unpaid base salary and incentives prorated through the end of the month of the termination and unused but accrued vacation. All parties concede that the triggering events provided in sections 2.1(b), 2.2, 2.3, and 2.6(a) did not occur and, therefore, do not give rise to any obligation on Cardinal's part.

In addition, plaintiffs contend that section 2.5 is not involved and that the defendants were terminated as a matter of law

only under section 2.8, an event which does not entitle them to collateralized benefits. Defendants contend, however, that section 2.8(d) terminates only Cardinal *obligations* under the contract, unless vested, section 2.8(e), and that their *employment* was terminated without cause pursuant to section 2.5 which does entitle them to their vested collateralized benefits. Plaintiffs counter that there is no vesting of benefits under the letters of credit absent the occurrence of one of the triggering events.

Section 2.8 is included in these employment contracts pursuant to the requirements of FHLBB regulation. 12 C.F.R. § 536.39(b). This provision affords FSLIC greater flexibility when entering an assistance agreement with a troubled thrift in dealing with employment contracts negotiated by that institution in the past. 47 Fed.Reg. 17471 (1982).

This contract is clearly drafted as to the sections here in issue. Section 4.1 provides for collateralized benefits upon the occurrence of certain events which are specified in section 2. None of those events occurred in this case. · Defendants' employment was terminated as a matter of law under section 2.8; this is not one of the triggering events specified in section 4.1. Approval of the contracts was given on July 14, 1988 by Summers on behalf of the Cincinnati Bank with this distinction clearly in mind. See Plaintiffs' Exhibits and 4, Tab 14 ("The approval of the agreements as amended ... shall in no way effect [sic] the enforceability of section 2.8 of [the] agreements.").

Section 2.8 operated to terminate Cardinal's obligations under the contract, unless vested, when FSLIC entered the assistant agreement with First Nationwide on December 30, 1988. The collateralized benefits could not "vest," as that term is used in the agreement, as they are subject to a condition precedent. The defendants conceded during testimony that they would not be entitled to the benefits if they voluntarily terminated the agreements or if they were terminated for cause as provided in section 2.4. Furthermore, section 2.8 is included as a requirement under a FHLBB

regulation to be used to relieve just such obligations entered by a troubled thrift.

Defendants, nevertheless, advance an interesting theory of contract interpretation. First, they note that the legislative history underlying regulation § 563.39 demonstrates that it relates only to the power to terminate continued employment *under the contract* and does not constitute dismissal or affect vested rights. 47 Fed.Reg. 17,471 (1982). They claim that they were in fact dismissed without cause pursuant to section 2.5 which did trigger the operation of section 4.1 to entitle them to collateralized benefits. However, the plain language of section 2.8(d) states that "[a]ll obligations under this Agreement shall be terminated" when an assistance agreement is entered. This occurrence cuts off any obligation which arguably is incurred if section 2.5 is later called into play. In other words, even if the termination of employment is without cause, once section 2.8(d) operates, it cuts off any contractual and financial obligation under section 2.5, unless vested.

There is no definition of "vested" in the FHLBB statutes or regulations. Defendants urge the court to apply a definition approved by Ohio courts and those of other states as it relates to severance benefits. In *Bolling v. Clevepak*, 20 Ohio App.3d 113, 120–21, 484 N.E.2d 1367 (Erie County Ct.App.1984), severance pay was considered a form of deferred compensation for continued service, an earned benefit which accrues over the course of an employment relationship. Once services are rendered under this definition, the right to severance benefits is considered earned and survives termination of the contract.

The only court reviewing the word "vested" in the regulation at issue in this case interpreted it to require a triggering event to occur before severance benefits vest. *Wilde v. First Federal Savings & Loan Ass'n of Wilmette*, 134 Ill.App.3d 722, 89 Ill.Dec. 493, 480 N.E.2d 1236 (1985). The court found that the plaintiff's contract had expired by operation of law before his actual employment was terminated and thus vesting could not take place regardless of the reason for his termination. Although

there are distinguishable facts between the two cases, the interpretation of the word "vested" is instructive in this case. The *Wilde* court rejected the definition advanced by defendants in the instant cause.

Federal common law rather than state law has been invoked in cases involving FSLIC's rights and obligations. *See Federal Savings & Loan Ins. Corp. v. Lafayette Investment Properties, Inc.*, 855 F.2d 196, 197–98 (5th Cir.1988); *Federal Savings & Loan Ins. Corp. v. Murray*, 853 F.2d 1251, 1255 (5th Cir.1988); *Taylor v. Security Trust Fed. Savings & Loan Ass'n, Inc.*, 844 F.2d 337, 342 (6th Cir. 1988); *Federal Deposit Ins. Corp. v. Armstrong*, 784 F.2d 741, 744 (6th Cir.1986). Under federal common law involving the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*, the term "vested" or "nonforfeitable," has been defined to mean a claim arising from a plan participant's service which is unconditional. 29 U.S.C. § 1002(19); *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 366–67 n. 10, 100 S.Ct. 1723, 1728–29 n. 10, 64 L.Ed.2d 354 (1980). This definition is consistent with the interpretation given the term in the context of this case.

In summary, the defendants' employment contracts terminated by operation of law pursuant to section 2.8(d). They are not entitled to collateralized benefits provided for in section 4.1 if their contracts terminate in this manner. Furthermore, as the operation of section 2.8 terminates all obligations under the contract, and occurred before defendants employment was terminated, their right to the collateralized benefits did not vest. Accordingly, the plaintiffs likelihood of success on the merits of this issue is quite strong.

### 3. Irreparable Injury

The strength of the first factor, as found by this court, impacts on the balancing of harm as between the plaintiffs and defendants which will occur if this injunction is granted. Having decided that FSLIC is likely to succeed on the merits, the correct standard to be applied to the irreparable harm analysis is whether FSLIC has shown a possibility of dissipation of the assets. *Federal Savings and Loan Insurance Corp. v. Sahni*, 868 F.2d 1096 (9th Cir. 1989). The evidence does show such a possibility. The defendants are not presently employed and would accept employment outside of the state involving relocation of their families and their assets. Furthermore, defendant Gannon testified that he is looking for a small business to purchase and may look to the funds at issue here to effect that purchase. In addition, the funds would be taxable as ordinary income once released to the defendants. All of these consideration certainly lead to the conclusion that there is a possibility of dissipation.

On the other hand, injury to defendants is not a strong consideration in view of the resolution of the issue of their entitlement to the funds. Thus, the balance of injury analysis favors granting the motion for preliminary injunction.

### 4. Injury to Others

There is no injury discernable to any third party in requiring the funds to be held pending the resolution of this lawsuit.

### 5. Public Policy

There is a public interest in preserving funds of a FSLIC-assisted troubled thrift institution. The court has interpreted the contract and regulations at issue in this case to entitle the plaintiffs to the disputed funds. Therefore, public policy also favors granting the motion.

Accordingly, plaintiffs' motion for preliminary injunction is granted.

IT IS SO ORDERED.