FEDERAL SAVINGS AND LOAN IN-SURANCE CORPORATION and Cardinal Federal Savings Bank, Plaintiffs–Appellees,

v.

Robert W. QUINN and Daniel J. Gannon, Defendants–Appellants.

No. 89–3451.

United States Court of Appeals, Sixth Circuit.

Argued April 5, 1990.

Decided Jan. 7, 1991.

Irene C. Walker, Beth Whitmore, Harry D. Cornett, Jr. (argued), Arter & Hadden, Cleveland, Ohio, Stephen Kessler, Trial Atty., Office of the General Counsel, Washington, D.C., for plaintiffs-appellees.

Nancy A. Shaw, Spieth, Bell, McCurdy & Newell, Cleveland, Ohio, Matthew J. Flynn (argued), John P. Fredrickson, James D. Friedman, Quarles & Brady, Milwaukee, Wis., for defendants-appellants.

Before MERRITT, Chief Judge, KRUPANSKY and MILBURN, Circuit Judges.

MERRITT, Chief Judge.

This is an action to enjoin the payment of severance benefits arising from employment contracts between plaintiff Cardinal, a failed thrift, and defendant bank officials. The case requires an interpretation of whether a regulation allowing avoidance of some employment contracts of troubled savings and loans, 12 C.F.R. § 563.39(5) (1990), permits the Federal Savings and Loan Insurance Corporation ("FSLIC")[1] and an insolvent thrift (Cardinal Federal Savings Bank) to avoid paying severance benefits to two officers recruited by FSLIC to prepare the thrift for acquisition. The regulation reads as follows:

(5) All obligations under the [employment] contract shall be terminated, except to the extent determined that continuation of the contract is necessary of [sic] the continued operation of the association

(i) by the Director or his or her designee, at the time the Federal Deposit Insurance Corporation or Resolution Trust Corporation enters into an agreement to provide assistance to or on behalf of the association under the authority contained in 2[13](c) of the Federal Deposit Insurance Act; or

(ii) by the Director or his or her designee, at the time the Director or his or her designee approves a supervisory merger to resolve problems related to operation of the association *or when the association is determined by the Director to be in an unsafe or unsound condition.* Any rights of the parties that have already vested, however, shall not be affected by such action.

12 C.F.R. § 563.39(5)(i) and (ii) (1990). (Emphasis added).

That ambiguous regulation provides in subsections (i) and (ii) that all obligations under employment contracts are terminated automatically by FSLIC at the time FSLIC enters an "agreement to provide assistance" to a struggling institution, or "approves a supervisory merger to resolve problems related to [the bank's] operation," or determines that the bank is "in an unsafe or unsound condition." 12 C.F.R. § 563.39(5)(i) and (ii) (1990). There is an exception to termination, however, which we find to be applicable and to protect the contracts in question from termination. An employment agreement is made immune from termination under that regulation "to the extent determined that continuation of the contract is necessary [to] the continued operation of the institution." *Id.* at § 563.39(5). Further, employee rights

---

**1.** Although Federal Deposit Insurance Corporation ("FDIC") is the statutory successor to FSLIC, *see* 12 U.S.C.A. 1821a (West 1989) (creating FSLIC Resolution Fund managed by FDIC), this opinion refers to FSLIC in place of what since has become the interest of FDIC because it was FSLIC's interest that has been litigated throughout this suit.

that have "vested" at the time of the assistance agreement are expressly excluded from automatic termination, *id.*, a provision we find unnecessary to interpret in light of our disposition based on the above-mentioned exception.

Defendants Quinn and Gannon, hired to manage the insolvent Cardinal Federal Savings Bank and to prepare it for acquisition, were fired after one year of service when First Nationwide Financial Services purchased Cardinal's assets and liabilities with FSLIC assistance.[2] After being fired by First Nationwide, defendants obtained the proceeds of certain letters of credit which secured the severance benefits, and Cardinal and FSLIC sued for a preliminary injunction to enjoin defendants from using the proceeds. The District Court issued the injunction. The defendant officers now appeal from District Judge Bell's order enjoining them from using the proceeds of letters of credit paid under a severance-pay agreement negotiated for Cardinal by FSLIC. *Federal Sav. & Loan Ins. Corp. v. Quinn*, 711 F.Supp. 366, 379 (N.D.Ohio 1989). We disagree with the District Court's conclusion that the preliminary injunction should issue. Although FSLIC, pursuant to section 563.39(5)(ii), apparently determined that Cardinal was in an "unsafe or unsound condition," which would ordinarily terminate Cardinal's obligations under its employment contracts with Quinn and Gannon, FSLIC triggered the exception through actions that amount to a determination that continuation of those employment contracts until their negotiated expiration date was necessary to improve Cardinal's "unsafe or unsound" condition. Therefore, because Quinn and Gannon were fired during the life of their employment contracts, which FSLIC knowingly entered into with the hope of rescuing Cardinal from insolvency, we vacate the District Court's order entering the preliminary injunction.

**2.** Although section 2.7(a) of the employment agreements indicates that First Nationwide may have assumed the obligation of Cardinal upon purchasing Cardinal's assets, and therefore may be required to indemnify Cardinal for the amount of the treasury bills put up by Cardinal to collateralize Quinn and Gannon's employment benefits, First Nationwide is not a party to this action. We do not decide, therefore, any questions pertaining to the rights and obligations of First Nationwide.

**I**

FSLIC finally transferred Cardinal to First Nationwide on December 30, 1988, after exercising supervisory control for more than a year. During that period, Quinn (Chief Executive Officer) and Gannon (Chief Operating Officer) were recruited by FSLIC to help stave off Cardinal's impending insolvency flowing from years of alleged mismanagement by the prior officers, who stepped down under pressure from FSLIC. Shortly after beginning work on November 24, 1987, Quinn and Gannon, along with Cardinal's other officers, entered a consent agreement on December 17, 1987, under which the Federal Home Loan Bank Board ("Bank Board"), as operating head of FSLIC, took general supervisory control of Cardinal. Among the supervisory powers granted to the Bank Board was the right to approve or reject all employment contracts. Quinn and Gannon's contracts, approved by Cardinal on February 10, 1988 and by the Bank Board on July 14, 1988, followed lengthy negotiations with Gerald Summers, who supervised the insolvency and acquisition on behalf of FSLIC. The contracts were for one year, beginning November 24, 1987. When Quinn and Gannon were hired, they, FSLIC, and Cardinal understood that Cardinal would be acquired, that FSLIC assistance would be necessary to the acquisition, and that if anyone other than Chicago West Pullman—a private group of investors—acquired Cardinal, they would be fired.

Apparently concerned about their job security in such uncertain times, Quinn and Gannon approached Summers and proposed some contractual protections for themselves, most of which were rejected. FSLIC did acquiesce, however, to a one-year automatic contract renewal if either party failed to give written notice of termination at least 90 days prior to the expiration of the contract. In fact, Quinn and

Gannon's contracts were renewed on December 1, 1988 pursuant to this clause.[3] FSLIC also agreed to pay severance benefits to Quinn and Gannon if they were terminated without cause. Under the severance-benefits agreement, Cardinal was obligated to pay Quinn and Gannon's salaries until the end of the current term, plus 100% of their annual salaries, prorated benefits and unused vacation time, and to extend insurance and other benefits for one year. *See* Employment Agreements § 2.5, J.A. at 307–09.

In exchange for these benefits, Quinn and Gannon each accepted $100,000 less in annual salary than they had bargained for in the absence of the severance benefits. In addition to their $210,000 (Quinn) and $200,000 (Gannon) salaries, their benefits were collateralized by $820,000 (twice their annual salaries) in letters of credit issued by nonparty Society National Bank and secured by U.S. Treasury securities held by Cardinal. In order to draw down on the letters of credit, each officer needed only to present a sight draft and certificate of beneficiary showing that they were entitled to the funds.

On December 30, 1988, First Nationwide Financial Services acquired Cardinal with FSLIC assistance and fired Quinn and Gannon eleven months before the expiration of their contracts. When Quinn and Gannon presented the required documentation to draw on the letters of credit, FSLIC and Cardinal sued, and FSLIC moved to enjoin payment. By agreement of the parties, and in order to release Society National Bank from further involvement in the dispute, the proceeds were paid to Quinn and Gannon, but were not to be wasted or otherwise encumbered pending the preliminary injunction hearing before Judge Bell. *See* Stipulated Judgment Entry.

## II

The District Court held that the employment contracts precluded the defendants, Quinn and Gannon, from obtaining their severance benefits. In so doing, the Court considered two distinct sections of the employment agreements. The first of those sections, section 2.8, incorporated the language of 12 C.F.R. § 563.39 (1990), which releases FSLIC from all contractual obligations upon "entering an agreement to provide assistance on behalf of Employer." [4] That provision, however, "shall not effect rights hereunder which are vested at the time of such termination." Both Quinn and Gannon testified that they understood that section 2.8 was part of their employment agreements, and that it would be triggered in the event of a FSLIC-assisted acquisition. The District Court did not address that portion of section 2.8 and of the federal regulations referring to the contin-

---

**3.** In the proceedings below, Judge Bell reported FSLIC's contention that Quinn and Gannon's employment contracts should be avoided because they breached their fiduciary duty by not seeking approval of the renewal of their contracts pursuant to paragraph 16(*o*) of the consent agreement. *See Quinn,* 711 F.Supp. at 377. Judge Bell also rejected the claim of Quinn and Gannon that FSLIC lacked standing to litigate. *See id.* at 376. The propriety of neither of these rulings is challenged on appeal.

**4.** The employment contracts state in pertinent part:

2.8 *Termination or Suspension as Required by Law.*

Notwithstanding anything in this Agreement to the contrary, the following provisions shall limit the obligations of Employer, to the extent required by the applicable regulations of the Federal Savings and Loan Insurance Corporation (12 C.F.R. 563.39), or similar succeeding regulations:

(d) All obligations under this Agreement shall be terminated, except to the extent determined that continuation of this Agreement is necessary for the continued operation of Employer, (i) by the FSLIC, at the time the FSLIC enters into an agreement to provide assistance to or on behalf of Employer under the authority contained in Section 406(f) of the National Housing Act; or (ii) by the Federal Home Loan Bank Board, at the time the Board or its principal supervisory agent approves a supervisory merger to resolve problems related to operation of Employer or when Employer is determined by the Board to be in an unsafe or unsound position.

(e) Termination or suspension pursuant to subparagraphs (a), (b), (c), and (d) hereunder, shall not effect rights hereunder which are vested at the time of such termination.

*Quinn,* 711 F.Supp. at 371–72.

uation of contracts necessary to the continued operation of the troubled thrift.

The second part of the employment agreements that the District Court addressed is section 4.1, which deals with the letters of credit. That section guarantees payment of the severance benefits by letter of credit if certain contingencies occurred as set forth in sections 2.1(b) (natural expiration of the term of employment), 2.2 (death), 2.3 (disability), 2.4 (voluntarily by employee or by employer for cause), 2.5 (by employer without cause or by employee with cause), or 2.6(a) (if specified events occur following a change in control). Section 4.1 does not, however, anywhere mention section 2.8(d) of the employment agreements. Section 4.1 stated:

4.1 *Collateral for Obligations of Employer.*

Employer hereby agrees that the performance of its obligations under §§ *2.1(b), 2.2, 2.3, 2.5, or 2.6(a)* (other than employer[']s obligations relating to participation by executives in any pension or savings plan) will be secured by an irrevocable collateralized clean Letter of Credit....

Appellee's Brief at 10 n. 5.

The District Court dealt only with section 2.5 covering termination without cause and did not address the exceptions covered in the regulation. In the proceedings below, "all parties concede[d] that the triggering events provided in sections 2.1(b), 2.2, 2.3, and 2.6(a) did not occur and, therefore, do not give rise to any obligation on Cardinal's part." *Quinn,* 711 F.Supp. at 377. Quinn and Gannon contend that they were terminated without cause within the meaning of section 2.5 when First Nationwide took over and installed their own managers. The District Court rejected that argument, however, ruling instead that section 2.8(d) terminated Cardinal's contractual obligations before First Nationwide purchased Cardinal. In the District Court's view, "once section 218(d) operates, it cuts off

any contractual and financial obligation under section 2.5, unless vested." *Id.* at 378.

### III

Given that section 563.39 recognizes certain exceptions to the automatic termination of contractual obligations in the event of a FSLIC-assisted takeover, we asked that the parties brief whether the language of 12 C.F.R. § 563.39(b)(5)(i) (1990) was applicable to this case; that is, whether the consent agreement vesting FSLIC with plenary authority over Cardinal's activities constituted "an agreement to provide assistance" within the meaning of 12 U.S.C.A. § 1729(f)(1) (West 1989) (provision of National Housing Act governing assistance to thrift institutions). We also asked that the parties address the applicability of section 563.39(b)(5)(ii), which continues when necessary the operation of contracts which would otherwise be terminated following either a "supervisory merger" or a determination by FSLIC that a bank is "in an unsafe or unsound condition."

We need not decide whether the "assistance" provision of subsection (i) or the "supervisory merger" provision of subsection (ii) was triggered because Cardinal was in "an unsafe or unsound condition" under the disjunctive clause of subsection (ii). We therefore turn to the final clause in the quoted subsection, which refers to the continuation of contracts that are necessary to the continued operation of an institution that is "in an unsafe or unsound condition." Under 12 U.S.C.A. § 1464(d)(2)(A) (West 1989), which governs the Bank Board's authority to initiate cease and desist proceedings, the Bank Board, once it determines that a savings and loan "is about to engage[ ] in an unsafe or unsound practice in conducting the business of such association," shall delineate the unsafe or unsound practice and hold a hearing "to determine whether an order to cease and desist therefrom should issue against the association." The Bank Board cited Cardinal's violation of an insurance regulation, 12 C.F.R. § 563.13(b)(1) (1987), as the basis of its authority for initiating cease and desist

proceedings against Cardinal.[5] This determination is tantamount to a determination based on "unsafe or unsound" practices and FSLIC's course of administrative conduct is equivalent to a finding of "unsafe and unsound" conditions, which in turn led FSLIC to take supervisory control of Cardinal in preparation for a FSLIC-assisted acquisition.

After determining that Cardinal was in "an unsafe or unsound condition," FSLIC sought to remedy that condition by hiring Quinn and Gannon to sell off assets and defray Cardinal's soaring liabilities in an effort to prepare the troubled thrift for acquisition. FSLIC, Quinn, and Gannon negotiated the employment contracts for eight months while the two newly hired officers worked toward decreasing the amount of assistance necessary to fund First Nationwide's acquisition of Cardinal. Certainly it was FSLIC's perception that employing new managers was necessary to the continued operation of Cardinal. FSLIC recruited and hired Quinn and Gannon specifically to eradicate the "unsafe or unsound condition" that prior management had created presumably because FSLIC thought it "necessary" to "the continued operation of the institution." The "extent determined" that "the [employment] contract is necessary" was expressed in the "extent" of the consideration bargained for by FSLIC in the contract itself. Quinn and Gannon would receive one-year renewable contracts and, if fired without cause, would be entitled to liquidated damages in the form of collateralized severance benefits. The fact that the work of Quinn and Gannon ultimately succeeded in effecting a FSLIC-assisted acquisition certainly does nothing to undercut FSLIC's determination that their continued employment was necessary to sustain Cardinal throughout the

life of the contracts, even if an acquisition preceded the expiration of the contracts. FSLIC negotiated and approved the contracts with its eyes open, well aware of the situation. It did not come into a failing thrift and exert control with contracts over which it had no say-so already in place. It negotiated the contracts itself. Once FSLIC recruited and negotiated the employment contracts providing the extent to which Quinn and Gannon's services would be needed to save Cardinal from its "unsafe or unsound condition," no subsequent act by FSLIC or Cardinal, be it a successful FSLIC-assisted acquisition or a supervisory merger, should interfere with the contracts or their legal consequences in the event of breach.

By promising to pay Quinn and Gannon specified salaries and benefits, including severance pay, and then by refusing to pay Quinn and Gannon only one month after renewing their contracts, the plaintiffs violated section 2.5 of the employment agreements. Section 2.5 sets forth the liquidated damages—the predetermined salary and benefits package that Quinn and Gannon would be entitled to if Cardinal terminated them without cause. The fact that it was First Nationwide and not Cardinal that actually fired Quinn and Gannon is beside the point. By refusing to pay Quinn and Gannon, and by severing them from their employment without cause—whether by a purchase and assumption agreement or otherwise—Cardinal breached its contracts with Quinn and Gannon. That breach is unaltered by the subsequent assistance agreement and acquisition. At the time of the assistance agreement and acquisition, the contracts between Cardinal and defendants were valid and enforceable, owing their very existence to FSLIC's mission to

---

**5.** The consent agreement stated in pertinent part:

WHEREAS, the FSLIC is of the opinion that the Institution has not complied with certain of the regulations to which the Institution is subject in conducting the business of the Institution, in particular Section 563.13(b)(1) of the Insurance Regulations (12 C.F.R. Section 563.13(b)(1) (1987)), for the calendar quarter ended September 30, 1987, thereby providing

grounds for the initiation of cease and desist proceedings against the Institution by the FSLIC; and

WHEREAS, in the interest of regulatory compliance and cooperation, the Institution is willing to enter into this Agreement to avoid the initiation of such cease and desist proceedings. . . .

Consent Agreement at 2, J.A. at 553.

improve Cardinal's "unsafe or unsound condition."

Any other reading would yield a result in conflict with the underlying purpose of the banking regulation in question. The history of section 563.39 indicates that the Bank Board designed that section to afford FSLIC "greater flexibility to reject abusive or excessive longterm employment and fringe benefit contracts executed by institutions that subsequently go into default [or] enter into an assistance agreement with the FSLIC...." 47 Fed.Reg. 17,471 (1982). The contracts in our case were not negotiated by Cardinal in the past, nor did they bestow huge benefits on the very managers who were responsible for the bank's demise. Instead, these contracts were negotiated by FSLIC with the hope of securing new managers who could successfully preserve assets and defray liabilities, thus preparing the institution for acquisition with less assistance than would have otherwise been required. Quinn and Gannon worked to realize this hope. FSLIC should not have to fund golden parachutes when it pushes out negligent or corrupt bank officers whose mismanagement of the bank necessitates FSLIC assistance. But that is not involved here. The managers seeking benefits in this case are two competent employees hired essentially by FSLIC. Their success at Cardinal may well have reduced the amount of assistance that FSLIC would have to provide in the inevitable takeover. Their contract for severance benefits thus should not be avoided simply because FSLIC's goal in recruiting

and hiring them in the first place was accomplished sooner than expected.

Because in our view the defendants' severance benefits were negotiated as critical components of employment contracts determined by FSLIC to be necessary to cure Cardinal's "unsafe or unsound condition," thus triggering the exception to automatic termination, the District Court's determination that plaintiffs are likely to prevail on the merits was erroneous. The preliminary injunction must therefore be dissolved. It is unnecessary for us to reach the question of whether Quinn and Gannon's rights under the employment contracts were "vested" within the meaning of section 563.-39(5).[6] Accordingly, the District Court's order issuing a preliminary injunction in favor of plaintiffs is vacated and the case remanded to that Court for further proceedings not inconsistent with this opinion.

KRUPANSKY, Circuit Judge, dissenting.

The panel majority's conclusion that once the Federal Home Loan Bank Board (FHLBB) determines an institution is in an "unsafe or unsound condition" and elects to regulate that institution through a consent agreement and to exercise control over its employment agreements, all such agreements are automatically exempt from termination pursuant to 12 C.F.R. section 563.39(b)(5) misconceives the intent, purpose and application of the statutory scheme regulating Federal savings and loans, the National Housing Act, 12 U.S.C.

---

**6.** Section 563.39 provides that "[a]ny rights of the parties that have already vested, however, shall not be affected by such action." Quinn and Gannon argue that their contract rights are vested under this provision. They contend that they were not fired by operation of law but were fired without cause eleven months before their contracts expired. In their view, their rights in continued employment under one-year renewable contracts had vested when they entered those contracts with FSLIC, as had their rights to the liquidated damages set forth in the contracts. The "vested" nature of these rights, Quinn and Gannon contend, is further reinforced by the collateralization of the liquidated damages in the form of irrevocable letters of credit guaranteed by treasury notes. The collateralization, they argue, admittedly a "conces-

sion" on Summers's part, see J.A. at 467, was negotiated solely to give Quinn and Gannon a heightened expectancy interest in their job security or in the financial consequences should their job security turn out to be illusory.

In rejecting that argument, the District Court reasoned that because "defendants' employment agreements terminated by operation of law pursuant to section 2.8(d)," they in effect were fired before First Nationwide acquired Cardinal and thus could not have been fired without cause within the meaning of section 2.5 of the employment contracts. Quinn, 711 F.Supp. at 379. As a result, because defendants were not fired without cause, their entitlement to the severance benefits had not been triggered and thus their rights under the contracts had not "vested" under section 563.39. Id.

section 1701 *et seq.*, the Home Owners' Loan Act of 1933, 12 U.S.C. sections 1461–1468, and the Federal Home Loan Bank Act, 12 U.S.C. sections 1421–1449, as well as the consent agreement itself. And aside from resting on faulty factual premises, the majority's reasoning is incorrect in law and would deprive the FHLBB from exercising its regulatory authority through the more informal mechanism of a consent agreement.

The genesis of this controversy was the employment of Robert W. Quinn (Quinn) by Chicago West Pullman (CWP) during August, 1986 at a salary of $10,000 per month. CWP was and is a holding company which originally invested primarily in undervalued railroad companies in need of capital and management. In 1986, it decided to explore existing investment opportunities in the savings and loan industry. Quinn, with a background in financing and experience in the thrift industry, was retained to identify thrifts of interest to CWP.

Shortly after assuming his duties, Quinn surfaced Cardinal Federal Savings Bank of Cleveland (Cardinal) as a possible candidate for acquisition by CWP. Subsequent to initial inquiries during December, 1986, CWP issued a letter to Cardinal expressing an interest in its acquisition. As a result of preliminary negotiations between CWP and Cardinal, Quinn, as a representative of CWP, was provided with office space at Cardinal's headquarters to conduct a comprehensive survey of Cardinal's financial condition. CWP also retained the services of the accounting firm Arthur Andersen and Company to assist Quinn in examining Cardinal's assets.

Prior to December 1986 and continuing thereafter until its acquisition by First Nationwide Financial Corporation (First Nationwide), a subsidiary of Ford Motor Company, Cardinal was a federal mutual savings and loan association, owned by its depositors, chartered by the FHLBB pursuant to the Home Owners' Loan Act of 1933 and the National Housing Act.

Cardinal was, from its inception, insured by the Federal Savings and Loan Insurance Corporation (FSLIC),[1] without which insurance Cardinal and similar thrift associations would have been unable to secure the guarantee of the government for individual deposits. Without the deposits that this governmental guarantee attracted, Cardinal and its counterparts would have been severely limited in their ability to invest, acquire property, and extend loans. Thus, the risk of failure of thrifts rested directly and most heavily upon the FSLIC as insurer. Accordingly, Congress delegated to the FHLBB and FSLIC the broadest authority permitted by the Constitution to regulate insured institutions in order to minimize loss and depreciation of FSLIC insurance funds, to protect the FSLIC from the risks of business failure, and to preserve depositor confidence in savings institutions throughout the nation.

As early as 1984, FSLIC examiners noted that imprudent management at Cardinal had exposed it to possible financial losses. Although the FHLBB,[2] from 1986 through 1987, had been suggesting an infusion of new management and restructuring of loan practices to ensure against improvident loans, neither the FHLBB nor the FSLIC were then considering plenary action against Cardinal.

From December of 1986, Quinn pursued his assignment for CWP with the assistance of Arthur Andersen and Company on a daily basis from his office at Cardinal's headquarters. On or about March 5, 1987, a meeting was held between representatives of CWP, including Quinn, and members of Cardinal's Board of Directors. FHLBB and FSLIC examiners also attended this meeting. Quinn and CWP expressed concerns that Cardinal's financial

---

1. The FHLBB is an independent fiscal agency of the federal government. The FSLIC was a duly organized corporation engaged in insuring the deposits of federal savings and loans associations, which are subject to regulation by the FHLBB.

2. Hereafter, "FHLBB" refers to the Federal Home Loan Bank Board of Cincinnati, which was charged with the regulation of Cardinal.

condition and viability was less than they had initially anticipated and suggested various changes in management and loan practices and review procedures. As a result of the March meeting, Cardinal retained the services of Korn/Ferry, an executive search firm, to seek a candidate for the position of chief operating officer of Cardinal.

In August of 1987, CWP petitioned the FHLBB and FSLIC for permission to acquire Cardinal without FSLIC assistance. At about the same time, Korn/Ferry presented Cardinal with the name and resume of Daniel J. Gannon (Gannon) for consideration as a candidate for the position of chief operating officer of Cardinal. Gannon was a Certified Public Accountant who had served as president and CEO of Marine National Exchange Bank in Milwaukee, Wisconsin for a period of years. At the time, he was unemployed, having been terminated from his position at Marine National Exchange Bank some six months previously as a result of an acquisition of the Milwaukee bank. At the request of Robert Seaton (Seaton), the CEO of Cardinal, Gannon traveled to Cleveland for an interview.

Both Seaton and Quinn, neither of whom had previously known Gannon, were impressed with Gannon's credentials. Cardinal's Board of Directors, together with Quinn, initiated negotiations with Gannon for the purpose of employing him as the president and chief operating officer of Cardinal. A series of telephone conversations and meetings occurred between Gannon, Seaton, other Cardinal board members, and Quinn during the remainder of September and into October and November, which culminated in Gannon's employment on November 24, 1987 as president and chief operating officer of Cardinal.

Quinn, mindful of Korn/Ferry's continuing efforts to solicit candidates to fill the positions at Cardinal, agreed to become the CEO of Cardinal conditioned upon arriving at mutually acceptable terms of employment.[3] During initial negotiations between Quinn and Cardinal's Board of Directors, Quinn requested an annual salary of $210,000 for himself, which was equal to that being paid to Seaton, and, with Gannon's approval, an annual salary of $200,000 for Gannon.[4]

Contrary to the panel majority's suggestion, neither Quinn nor Gannon "accepted less in annual salary than they had bargained for in the absence of severance benefits." It was Quinn who fixed his and Gannon's salaries by initially requesting Cardinal's Board for $210,000 and $200,00, which amounts, together with the requested additional perks, including termination benefits, were approved by Cardinal's Board of Directors. Although the FHLBB and FSLIC were aware of the negotiations between Quinn/Gannon and Cardinal's Board of Directors, neither agency had authority to enter into those negotiations nor did they do so.

In addition, as early as October 1987, Gannon and Quinn had retained the services of Jones, Day, Reavis & Pogue and Baker & Hostetler, two of Ohio's largest and most prestigious law firms, to negotiate the specific terms and conditions of their written employment contracts with Cardinal. Quinn and Gannon entered upon their employment with Cardinal on November 24, 1987 without formal written employment contracts, although the broad parameters of their employment had been discussed and approved by Cardinal's

---

3. During October, 1987, it was decided by Cardinal's Board of Directors, including Seaton, that he, Seaton, would step down as Cardinal's Chief Executive Officer if Quinn would accept the position.

4. Quinn also requested various other perks for himself and Gannon, including but not limited to membership in or affiliation with a country club of their own selection, membership in the Union Club, which is a luncheon club, the full-time use of a Cadillac Seville or comparable vehicle with reasonable associated expenses, mortgage financing for personal residences, four-weeks annual vacation, employer-funded life insurance coverage in the amount of three times their respective salaries, medical insurance policies with Blue Cross/Blue Shield at employer's expense, participation in Cardinal's retirement income plan and its savings plan, and reimbursed business expenses for themselves and their wives.

Board of Directors.[5] Preliminary drafts of both employment contracts, which were essentially the same, were in existence by early November 1987, and these law firms represented both men until their written employment contracts were accepted and executed by Cardinal on February 10, 1988, and subsequently approved by the FHLBB on July 14, 1988.

Because final acceptance of the Quinn/Gannon employment contracts by Cardinal did not occur until after the execution of the consent agreement between the FHLBB and Cardinal on December 17, 1987, those contracts became subject to the regulatory authority of those agencies pursuant to existing statutory enactments and the conditions of the consent agreement. Although the FHLBB had previously approved indemnification of Quinn and Gannon for any and all acts and financial losses caused by the previous management, it refused to approve various material terms and conditions of the employment agreements as executed by Cardinal and Quinn/Gannon. The record is unclear as to the date on which the FHLBB ultimately formally approved these contracts, however, the appellants assert and the trial court concluded that such approval occurred on July 14, 1988.

Thus, contemporaneously with its negotiations with Quinn and Gannon, Cardinal's Board was negotiating a consent agreement with the FHLBB to forestall commencement of formal cease and desist proceedings. Prior to November 1987, supervision by both the FHLBB and the FSLIC extended only to Cardinal's loan evaluations and procedures, because both agencies were without sufficient evidence to initiate cease and desist proceedings pursuant to 12 U.S.C. section 1464(d). 12 U.S.C. § 1464(d) (1987) (amended 1989). However, on or about November 17, 1987, FHLBB agents had filed a Significant Supervisory Report which confirmed that Cardinal was on the verge of insolvency and which triggered those negotiations. Both Quinn and Gannon were aware of and participated in the consent agreement discussions.

As a result of their participation in the consent agreement negotiations, Quinn and Gannon were aware of Cardinal's insolvency when their respective lawyers were negotiating and finalizing their contracts. They knew they would be legally bound by the terms and conditions of the consent agreement between Cardinal and the FHLBB. They also knew that the consent agreement incorporated by statutory mandate 12 C.F.R. section 563.39(b)(5), as well as the legal implications of that statutory language, which required that their employment contracts specify that all contractual obligations would, by operation of law, be terminated under certain conditions, one being the provision of financial assistance by the FSLIC to the savings and loan. 12 C.F.R. § 563.69(5) (1987).[6] Thus, Quinn and Gannon, as well as their legal counsel, also knew and anticipated that their em-

---

**5.** On or about November 6, 1987, Quinn and Gannon had traveled to Cincinnati for the express purpose of introducing Gannon to Jerry Summers, who was the chief supervisory agent of the FHLBB, and other top personnel of the FHLBB and the FSLIC so "they could get a sense of who this man was that was probably going to become the new Chief Operating Officer of the bank."

**6.** 12 C.F.R. § 563.39 is entitled, "Employment contracts." It provides, in part:
(a) General. An insured institution may enter into an employment contract with its officers and other employees only in accordance with the requirements of this section.
(b) Required provisions. Each employment contract shall provide that:
(5) All obligations under the contract shall be terminated, except to the extent determined that continuation of the contract is necessary to the continued operation of the association. (i) by the Corporation [the FSLIC], at the time the Corporation enters into an agreement to provide assistance to or on behalf of the association under the authority contained in section 406(f) of the National Housing Act; or (ii) by the Federal Home Loan Bank Board, at the time the Board or its Principal Supervisory Agent (as defined in § 561.35 of this subchapter) approves a supervisory merger to resolve problems related to operation of the association or when the association is determined by the Board to be in an unsafe and unsound condition. Any rights of the parties that have already vested, however, shall not be affected by such action.
12 C.F.R. § 563.39 (1987).

ployment would be terminated if Cardinal was acquired with FSLIC assistance by someone other than CWP. As Quinn testified in recounting the contract negotiations, "When acquirers come into a situation, it is usually the two, top two guys they don't need. They have their own people."

Pursuant to paragraph 16(*o*) of the consent agreement, Cardinal submitted the Quinn/Gannon employment contracts to the FHLBB shortly after their execution on February 10, 1988.[7] Neither the FHLBB nor the FSLIC had any communication with Cardinal's Board or Quinn and Gannon concerning the employment contracts, which were forwarded shortly after February 10, 1988, until April 13. In a letter of that date, the FHLBB notified Cardinal that it objected to, among other conditions, the dual Quinn/Gannon CWP/Cardinal employment and the payment of $140,000 to each of them as bonuses for the year 1988. It insisted upon a revision of the indemnification agreement by reducing the amount of the letters of credit, which secured Quinn and Gannon's employment termination without cause, from three times their base salary. It also insisted upon the deletion of the incentive compensation provisions. In response, Quinn and Gannon submitted numerous amendments to the employment contracts for review by the FHLBB, most of which were resolved although the record is unclear as to the resolution of the dual

CWP/Cardinal employment status of Quinn and Gannon.[8]

In addition, it was explicit in Summers's letter of July 14, 1987 that the inclusion of 12 C.F.R. section 563.39(b)(5) into the Quinn and Gannon employment contracts was mandated by statute and nonnegotiable when he responded to Cardinal's last Quinn/Gannon submittals: "The approval of the agreements as amended, with the exception of incentive bonuses, shall in no way effect the enforceability of section 2.8 of Messrs. Quinn and Gannon's agreement." The above regulation, incorporated into those contracts as paragraph 2.8(d) & (e), provided:

2.8 *Termination or Suspension as Required by Law*

Notwithstanding anything in this Agreement to the contrary, the following provisions shall limit the obligations of Employer, to the extent required by the applicable regulations of the Federal Savings and Loan Insurance Corporation (12 C.F.R. § 563.39), or similar succeeding regulations:

(d) All obligations under this Agreement shall be terminated, except to the extent determined that continuation of this Agreement is necessary for the continued operation of Employer, (i) by the FSLIC, at the time the FSLIC enters into an agreement to provide assistance to or on behalf of Employer under the authority contained in Section 406(f) of the Na-

---

7. Paragraph 16(*o*) of the consent decree provided:

> [T]he Institution, *without prior written approval of the Agent*, shall not, and shall not allow any wholly-owned or majority-owned subsidiary or affiliate of the Institution to:
> (*o*) enter into, renew or revise any contractual arrangement with any officer, director, controlling person, affiliate, subsidiary or attorney or agent for or of the Institution or any of its subsidiaries

8. The record does not fully disclose the scope and magnitude of the continuing relationships, financial and otherwise, between CWP and Quinn/Gannon after they assumed their employment as officers of Cardinal or to what extent those relationships were, if at all, terminated. The record does, however, reflect with clarity that Quinn and Gannon each received a $10,000 monthly consulting fee from CWP

through at least April of 1988, and that each had a minimum Cardinal stock option commitment of one and possibly two million dollars from CWP if it successfully acquired Cardinal. Discussions had also been conducted concerning participation rights in future CWP acquisitions and position and salary advancements in a proposed CWP holding company.

It also appears from the record that after assuming his position as president and chief operating officer of Cardinal, Gannon ordered the accounting department to accrue on the financial records of Cardinal, commencing January 1, 1988, $140,000 annual bonuses for himself and for Quinn. Those bonuses would have become payable if CWP acquired the institution.

Although the record does not fully develop the interrelationship between the parties, it is, however, clear that it continues to some extent since CWP is assuming and funding the costs and attorneys fees for this litigation.

tional Housing Act; or (ii) by the Federal Home Loan Bank Board, at the time the Board or its Principal Supervisory Agent approves a supervisory merger to resolve problems related to operation of Employer or when Employer is determined by the Board to be in an unsafe or unsound condition.

(e) Termination or suspension pursuant to subparagraphs (a), (b), (c) and (d) hereunder, shall not affect rights hereunder which are vested at the time of such termination.

Although paragraph 4.1 of the Quinn and Gannon employment contracts provided for collateralization of certain termination rights as identified in paragraphs 2.1(b), 2.2, 2.3, 2.5, and 2.6(a),[9] terminations by operation of law under paragraph 2.8 of the employment contracts (12 C.F.R. § 563.39) were excluded unless the vested benefits exception of section (e) of paragraph 2.8 (12 C.F.R. § 563.39(b)(5)) was applicable. Incorporation of paragraph 2.8(d) & (e) into the collateralization requirements of paragraph 4.1 was intentionally omitted for the obvious reason that its inclusion would have been unacceptable to the FHLBB. It has been conceded by the appellants that none of the triggering events of paragraphs 2.1(b), 2.2, 2.3, and 2.6(a) have occurred to activate termination collateralization.

Contrary to the self-sacrificing image cast by the panel majority, Quinn and Gannon successfully exacted the maximum conditions of employment from Cardinal which they felt would be approved by the FHLBB within its statutory mandate. The employment contracts resulted from negotiations between Quinn/Gannon, their legal counsel, and Cardinal's Board of Directors. Neither the FHLBB nor the FSLIC had regulatory authority or inclination to participate in or interfere with those initial negotiations prior to the execution of the consent agreement between the FHLBB and Cardinal's Board of Directors on De-

cember 17, 1987. It is true that after March 1987, when Cardinal's financial condition became questionable, Quinn and Gannon and their legal counsel conducted a continuing dialogue with Summers and other representatives of the FHLBB, probing for the limitations the agency intended to impose upon the terms and conditions of any submitted employment contract. This probing intensified after the execution of the consent agreement between Cardinal and the FHLBB.

However, it should also be remembered that both Quinn and Gannon were highly sophisticated businessmen, experienced in executive management who, throughout the entire negotiations, were represented and advised by highly capable legal talent. They were keenly aware of the implications and consequences of 12 C.F.R. section 563.39(b)(5). They recognized that their employment with Cardinal in all probability would be terminated upon assisted acquisition by someone other than CWP. In sum, their acceptance of employment with Cardinal was a calculated business judgment predicated upon acquisition of Cardinal by CWP which, from December 1986 through at least August 1987, had "the inside track" as Cardinal's only interested suitor. They obviously concluded that future career opportunities with CWP outweighed the risks of employment with Cardinal, especially since they would be handsomely paid by both Cardinal and CWP during the interim period while CWP negotiated Cardinal's acquisition.

Although management under Quinn and Gannon significantly improved the financial condition of Cardinal, in March 1987, Quinn and Gannon conducted an entourage of CWP representatives to Cincinnati where Quinn, as spokesperson for CWP, advised Summers that CWP was withdrawing its petition to acquire Cardinal without assistance; however, it would pursue assisted acquisition. When it became apparent that

---

**9.** As noted by the majority panel's decision, paragraph 2.1(b) of the contract provided for termination of employment by reason of the expiration of the original or any extended term of the agreement, paragraph 2.2, by death, paragraph 2.3, by disability, paragraph 2.5, by employer without cause or by the executive for cause, and paragraph 2.6(a), by the executive due to change in control.

the FSLIC would be required to assist any acquisition of Cardinal, FSLIC solicited invitations to accomplish that result in August of 1988. CWP and others, including First Nationwide, presented assistance acquisition proposals between September and December of 1988. On December 1, 1988, the Quinn and Gannon employment contracts were automatically renewed.

CWP was not successful in its effort to acquire Cardinal, and First Nationwide assumed control of Cardinal with FSLIC assistance on December 30, 1988. On that same date, both Quinn and Gannon were advised that their respective contracts were terminated, that their services would no longer be required, and that their contracts would not be renewed by First Nationwide since it had its own senior officers in place to assume management and operation of Cardinal.

On January 17, 1989, Quinn and Gannon presented the letters of credit collateralizing their employment contracts to Society National Bank for payment. The letters of credit were honored by the bank, which prompted the FSLIC to initiate this action seeking declaratory judgment, preliminary and permanent injunctive relief to reacquire the funds paid over to Quinn and Gannon under the letters of credit as an asset of Cardinal. In response to the petition of the FSLIC, Quinn and Gannon charged that paragraph 2.8 was inapplicable to the cancellation of their employment contracts and asserted that they were discharged without cause within the meaning of paragraph 2.5 of their employment contracts when First Nationwide assumed management and operation of Cardinal and installed its own executive personnel. Thus, their collateralized benefits were due to them pursuant to paragraph 4.1 of the contracts.

Apart from FSLIC's standing to initiate these proceedings, the controversy of primary concern before the trial court and initially before this court on appellate review was the resolution of which paragraph, i.e., 2.5 or 2.8, of the employment agreements applied to Quinn and Gannon's terminations.

This was the single issue tried, briefed, argued, and decided by the lower court. This was the single issue initially joined, briefed, and argued before this court upon appeal. The majority disposition completely refuses to consider this issue and states, "We need not decide whether the 'assistance' provision of subsection (i) or the 'supervisory merger' provision of subsection (ii) was triggered because Cardinal was in 'an unsafe or unsound condition' under the disjunctive clause of subsection (ii)." For the first time during oral arguments before this court, to the surprise and consternation of all parties, the court sua sponte queried legal counsel and subsequently requested supplemental briefs on the issue of "whether the language of 12 C.F.R. § 563.39(b)(5)(1) (1990) was applicable to this case; that is, whether the consent agreement vesting FSLIC with plenary authority over Cardinal's activities constituted 'an agreement to provide assistance' within the meaning of 12 U.S.C. § 1729(f)(1) (West 1989) (provision of National Housing Act governing assistance to thrift institutions)." The court further directed the parties to address the "applicability of § 563.39(b)(5)(ii), which continues when necessary the operation of contracts which would otherwise be terminated following either a 'supervisory merger' or a determination by the FSLIC that a bank is 'in an unsafe or unsound condition.'" Although the FHLBB drafted the consent agreement, in part, to recognize and protect the FSLIC's interests in Cardinal, the FSLIC was not a signatory to the agreement and was not vested with plenary authority by virtue of the agreement. In addition, only the FHLBB, not the FSLIC, had the authority to determine whether an institution was in an unsafe and unsound condition or to initiate a supervisory merger.

The trial court treated this case as the fairly simple contract case it really was. It first addressed the issue of FSLIC's standing to bring suit against Quinn and Gannon. The FSLIC satisfied the injury-in-fact component of the standing requirement because it would be required to reimburse First Nationwide for the letters of credit.

This reimbursement was required by section 7 of the assistance agreement between FSLIC and First Nationwide, which provides that the FSLIC would indemnify First Nationwide for any "unreserved for" claims. The former chief financial officer for Cardinal testified that no specific reserve had been established for the letters of credit. In addition, since FSLIC was asserting its own legal rights in attempting to avoid an obligation of indemnification asserted against it, the prudential component of the standing requirements was satisfied.

The trial court then addressed the preliminary injunction standard and discussed the FSLIC's likelihood of success on the merits. As found by the trial court,

> This contract is clearly drafted as to the sections here in issue. Section 4.1 provides for collateralized benefits upon the occurrence of certain events which are specified in section 2. None of those events occurred in this case. Defendants' employment was terminated as a matter of law under section 2.8; this is not one of the triggering events specified in section 4.1. Approval of the contracts was given by Summers on behalf of the Cincinnati Bank with this distinction clearly in mind.
> *Federal Savings and Loan Insurance Corp. v. Quinn,* 711 F.Supp. 366, 377–78 (N.D.Ohio 1989).

Since section 2.8 operated to terminate Cardinal's obligations upon an FSLIC assisted acquisition, Quinn and Gannon were not entitled to collateralized benefits.

Quinn and Gannon contended these benefits had vested and were subject to the section 2.8 exclusion for vested obligations. In response, the trial court noted that the collateralized benefits could not vest, since they were subject to a condition precedent, namely discontinuance of employment pursuant to one of the conditions enumerated

in paragraphs 2.1(b), 2.2, 2.3, 2.5 and 2.6(a) of the employment contracts. Quinn and Gannon also noted that 12 C.F.R. section 563.39 automatically terminated their contractual employment only; it did not effect their dismissal and did not affect their vested rights.[10] Thus, according to their theory, when they were dismissed, they were dismissed without cause, which triggered their entitlement to collateralized benefits. However, as the trial court noted, "the plain language of section 2.8(d) states that '[a]ll obligations under this Agreement shall be terminated,' when an assistance agreement is entered," including any obligations under section 2.5 of the employment contracts. *Quinn,* 711 F.Supp. at 378.

The panel majority's disposition, however, is anchored in the conclusion that Cardinal was in an "unsafe or unsound condition" on November 24, 1987, the date that Quinn and Gannon entered upon their employment as CEO and president and chief operating officer of Cardinal respectively, or at any time before the execution of the consent agreement between FHLBB and Cardinal on December 17, 1987. To support that erroneous predicate, it has relied upon a phrase in the consent agreement which stated that Cardinal had violated "an insurance regulation, 12 C.F.R. § 563.13(b)(1)," and, according to the majority, this violation was "the basis of [the FHLBB's] authority for initiating cease and desist proceedings against Cardinal."[11] The majority erroneously reasons, "This determination is tantamount to a determination based on 'unsafe and unsound' practices and FSLIC's course of administrative conduct is equivalent to a finding of 'unsafe and unsound' conditions." Not only is this statement contrary to the developed facts, it ignores the legal distinction between the FHLBB and the FSLIC: two separate, albeit related, entities authorized

---

**10.** The regulation's history states:
Exercise of the power to terminate an employment contract only affects the officer's right to continue employment under the contract and neither constitutes dismissal nor affects vested rights.

47 Fed.Reg. 17,471 (1982).

**11.** Contrary to this statement, only the FSLIC, not the FHLBB, was authorized to commence cease and desist proceedings for violation of the insurance regulation.

by different sections of the code to pursue independent courses of action.

The majority's conclusion that Cardinal was in an unsafe and unsound *condition* to transact business within the mandate of 12 C.F.R. section 563.13(b)(1), *see generally Woods v. Federal Home Loan Bank Bd.*, 826 F.2d 1400, 1409 (5th Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1221, 99 L.Ed.2d 422 (1988), is an unsupported quantum leap from any FHLBB preliminary finding that Cardinal had engaged in unsafe or unsound *practices*. The FHLBB never initiated cease and desist proceedings against Cardinal nor was Cardinal ever formally determined to be in an "unsafe and unsound condition" as implied by the majority opinion.[12] Rather, the consent agreement was executed *in lieu of initiating a supervisory merger or determining that Cardinal was in an unsafe and unsound condition*, events which by operation of law would terminate the Quinn/Gannon employment contracts. The regulatory authority of the FHLBB was exercised solely by virtue of the *consent agreement* voluntarily executed on December 17, 1987 by Cardinal's Board of Directors, which included Robert W. Quinn and Daniel J. Gannon, both of whom had been elected to the board on November 24, 1987, when they were employed by Cardinal as chairman and chief executive officer and president and chief operating officer, respectively. Contrary to the majority panel's statement,

the FSLIC did not hire Quinn and Gannon and could not have made a determination in November or December 1987 that their contracts were necessary to the continued operation of Cardinal.

In addition, the very statutory authority that would have invoked 12 C.F.R. section 563.39 was not exercised by FHLBB when it entered into the consent agreement. The FHLBB was authorized to enter into the consent agreement pursuant to its authority to supervise and regulate savings and loans under the Home Owners' Loan Act of 1933, 12 U.S.C. sections 1461–1468.[13] The consent agreement, which was executed by the FHLBB's Supervisory Agent, states, "It is understood and agreed that this Agreement is a 'written agreement entered into with the [Federal Home Loan Bank] Board' as that phrase is used in section 5(d)(2) of the Home Owners' Loan Act, 12 U.S.C. Section 1464(d)(2) (1987)." Consent Agreement, para. 21. Section 1464(d)(2)(A) specifically provides that violation of a written agreement between the FHLBB and an institution constitutes cause to bring cease and desist proceedings.

The FSLIC's authority to provide financial assistance was entirely independent of the FHLBB's authority to enter into the consent agreement. The FSLIC's authority was granted by 12 U.S.C. section 1729(f), which stated:

12. The cease and desist proceedings would have resulted from Cardinal's violation of 12 C.F.R. section 563.13(b)(1), which described the capital requirements for a savings and loan. 12 C.F.R. § 563.13(b)(1) (1987). Contrary to the majority opinion, violation of a FHLBB regulation is an entirely distinct offense from engaging in unsafe and unsound practices, and either action is sufficient to support cease and desist proceedings. 12 U.S.C. § 1464(d) (1987) (amended 1989).

As stated in the third whereas clause of the agreement, the FHLBB premised its authority to enter into the consent agreement upon the existence or future existence of one or more of the infringements specified in 12 U.S.C. section 1464(d)(5), (6)(A)(i) through (iii) for the appointment of a conservator, receiver, or other legal custodian for Cardinal pursuant to section 406 of the National Housing Act, as amended (12 U.S.C. Section 1729).

12 U.S.C. section 1464(d)(5), (6)(A)(i)–(iii) provided the following reasons for appointment of a receiver: insolvency; an unsafe or unsound condition to transact business; willful violation of a cease and desist order; and concealment of books. 12 U.S.C. § 1464(d) (1987) (amended 1989). The consent agreement does not specify which of these transgressions existed, however, since the threatened cease and desist proceedings would have been predicated upon Cardinal's disregard for regulatory capital requirements and its insolvency, insolvency was or would have been the basis for the appointment of a receiver.

13. The Act provides: "[T]he Board is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of associations to be known as Federal savings and loan associations." 12 U.S.C. § 1464(a) (1987) (amended 1989).

(1) The Corporation is authorized, in its sole discretion and upon such terms and conditions as the Corporation may prescribe, to make loans to, to make deposits in, to purchase the assets or securities of, to assure the liabilities of, or to make contributions to any insured institution—

(A) if such action is taken to prevent the default of such institution;

. . . .

(2)(A) In order to facilitate a merger or consolidation of an insured institution ... or the sale of assets of such insured institution and the assumption of such insured institution's liabilities by another insured institution.

12 U.S.C. § 1729(f) (repealed 1989).

The FSLIC clearly exercised this independent power through or by virtue of the assistance agreement.

The majority panel has determined that since 12 C.F.R. section 563.39(5)(b)(*ii*) initially was invoked by the FHLBB upon the execution of the consent agreement, section 563.39(5)(b)(*i*) became forever inoperative even though the FSLIC opted, by virtue of its independent authority, to assist in the acquisition of Cardinal pursuant to section 563.39(5)(b)(i). However, even if, assuming arguendo, the FHLBB had determined, after the execution of the consent agreement, that under 12 C.F.R. section 563.39(b)(5)(ii) the employment of Gannon and Quinn was necessary to the continued operation of Cardinal, the FSLIC nevertheless retained its regulatory perogative, after it entered into the assistance agreement, to invoke 12 C.F.R. section 563.-39(b)(5)(i) and its termination of employment contracts by operation of law in the absence of its independent determination that the employment of Gannon and Quinn was necessary to the continued operation of Cardinal.

As noted by the trial court, the legislative history surrounding 12 C.F.R. section 563.39 reflects that it was intended to afford FSLIC with "greater flexibility when entering an assistance agreement with a troubled thrift in dealing with employment contracts negotiated by that institution in the past." *Quinn*, 711 F.Supp. at 378; 47 Fed.Reg. 17,471 (1982). The provisions added to the regulation were enacted to provide protection for the FSLIC. *See, e.g.*, 49 Fed.Reg. 45,847 (1984). First Nationwide, when it submitted its petition for the acquisition of Cardinal with the FSLIC's assistance, relied upon the FSLIC's ability to make enforceable employment determinations. Instead, the panel majority would impose upon the acquirer and the FSLIC two officers who had no duties and whose employment contracts First Nationwide refused to renew after the FSLIC assisted acquisition.

The majority panel's erroneous interpretation of the regulation deprives the FHLBB and the FSLIC of their broad remedial powers, and its failure to distinguish between the statutory authority delegated to the FHLBB and the FSLIC dilutes and subverts their congressional mandate to regulate the savings and loan industry. Accordingly, I would affirm the trial court's resolution of the issues joined, tried, briefed, and argued before it by adopting its well-reasoned and thoughtful opinion. I must, however, respectfully enter my dissent to the panel majority's disposition of this controversy on issues foreign to the trial court and this appellate review. But more particularly, for the reasons stated herein, I take exception to the majority's interpretation of and reasoning addressing the congressional enactments material to this action.