_____

No. 94-3763
_____

Elmer Ernest Romines;           *
Marjorie R. Romines;            *
Marilyn F. Romines;             *
Marjorie Ann Romines,           *
                                *  Appeal from the United States
          Appellants,           *  District Court for the
                                *  Eastern District of Missouri.
     v.                         *
                                *
The Great-West Life Assurance   *
Company, a corporation; Great-  *
West Life Annuity Insurance     *
Company, a corporation;         *
Progressive Ozark Bank, a       *
Federal Savings Bank,           *
                                *
          Appellees.            *

_____

Submitted:  April 10, 1995

Filed:  January 19, 1996
_____

Before FAGG, Circuit Judge, HENLEY, Senior Circuit Judge, and
     BOWMAN, Circuit Judge.

_____

HENLEY, Senior Circuit Judge.

     This is a diversity of citizenship action by Elmer Ernest
Romines and his wife and daughters (collectively, Romines) against
Progressive Ozark Bank of Salem and Houston, Missouri (Progressive
Ozark Bank) and two insurance companies, Great-West Life Assurance
Company and Great-West Life Annuity Insurance Company
(collectively, Great-West).  Romines sought declaratory and other
relief under a Consulting Agreement he entered with a predecessor
of Progressive Ozark Bank and under the provisions of two annuity
contracts purchased from Great-West to fund payments due under the

Consulting Agreement. The parties filed cross motions for summary judgment and the district court[1] granted summary judgment for defendant, Progressive Ozark Bank. Romines v. Great-West Life Assurance Co., 865 F. Supp. 607 (E.D. Mo. 1994). Romines filed a timely notice of appeal from the judgement of the district court under 28 U.S.C. § 1291. We affirm.

## BACKGROUND

From October 1974 until his resignation in March 1991, Elmer Romines served as president and chairman of the board of Progressive Federal Savings Bank (Progressive Federal) of Houston, Missouri. In order to allow Progressive Federal to begin a transition to new management, in September 1988, Romines and Progressive Federal entered into a Consulting Agreement. Under the terms of the agreement, Romines would continue to serve in his executive positions only so long as the bank board desired. In addition, under the Consulting Agreement Romines agreed to take a $12,000 per year reduction from his then current salary. In return, the Consulting Agreement provided that Romines would be paid $4,000 per month for consulting services for five years from the date of the agreement and approximately $2,000 per month for an additional ten years. As required by law, the Consulting Agreement contained several provisions setting forth conditions to Progressive Federal's obligation to continue payments under the Consulting Agreement. Included in these conditions was a provision that the Consulting Agreement would automatically terminate if Progressive Federal was ever determined by federal regulators to be in an unsafe and unsound financial condition.

To fund Romines' compensation under the Consulting Agreement, Progressive Federal purchased two single premium annuities from Great-West. The annuities provided that Progressive Federal was

---

[1]The Honorable George F. Gunn, United States District Judge, Eastern District of Missouri.

the owner of the annuity policies, Elmer Romines was designated the payee, and Romines' wife and daughters were named as beneficiaries in the event of his death.  Beginning November 1, 1988 and continuing until its termination in March 1991, Romines was paid under the annuities pursuant to the Consulting Agreement.

Like many savings banks, Progressive Federal faced financial difficulties in the late 1980s.  In the autumn of 1990, separate examinations of Progressive Federal by the Federal Deposit Insurance Corporation (FDIC) and the Office of Thrift Supervision (OTS) concluded that Progressive Federal was technically insolvent. FDIC and OTS gave Progressive Federal the choice of either pursuing a merger with another financial institution or being placed in receivership.  Thus, on December 21, 1990, in lieu of receivership, Progressive Federal and OTS entered into a Consent Agreement under which Progressive Federal acknowledged that it was insolvent and could be placed in receivership and that both Progressive Federal and OTS would seek a healthier institution to merge with Progressive Federal.

Although Romines disagreed with a number of the factual findings of the FDIC and OTS reports, neither he nor Progressive Federal formally challenged the audit reports.  Under Romines' leadership the board of Progressive Federal discussed merger options with a number of other institutions.  In March 1991, Romines recommended a merger with Ozark Rivers Savings Bank (Ozark Bank) of Salem, Missouri.

At the same time as the merger negotiations were ongoing, the OTS became concerned about Romines' continued leadership of Progressive Federal.  In particular, OTS noted that the FDIC and OTS audits had shown questionable expenditures by Progressive Federal on items for Romines and his family.  Moreover, given the bank's precarious financial situation, OTS questioned the continuing payments to Romines under the Consulting Agreement. Accordingly, on March 7, 1991, Lyle A. Townsend, OTS Assistant Director, sent Progressive Federal a letter stating that because

OTS had determined that Progressive Federal was insolvent and thus in an unsafe and unsound condition, its obligations under the Consulting Agreement had automatically terminated. The letter directed Progressive Federal immediately to cease all payments to Romines under the Consulting Agreement.

Progressive Federal's board met on March 13, 1991 and voted to approve the merger with Ozark Bank. The board also reviewed the March 7 OTS letter but resolved to continue paying Romines under the Consulting Agreement at least until the merger was completed. After the adoption of that resolution, Romines resigned his official positions as President, Chairman and Director of the Bank, but continued his management role at the bank and continued to collect his consulting fees.

On March 21, 1991, OTS' Townsend again wrote to the Progressive Federal board regarding the directed termination of the Consulting Agreement. The letter warned the members of the board of directors that they might be held personally liable for future payments under the Consulting Agreement. The letter also stated that OTS would not approve the proposed merger as long as the Consulting Agreement was still in place. After this second warning, at a special board meeting on March 26, 1991, Progressive Federal's board unanimously voted to terminate the Consulting Agreement. In addition, the board directed Great-West to make Progressive Federal the payee and beneficiary for all future payments under the annuities. On May 14, 1991, OTS' Regional Deputy Director, Donald W. Wente, and its Regional Director, Billy C. Wood, confirmed in writing that Progressive Federal was unsafe and unsound to transact business because it had substantially insufficient capital.

On May 30, 1991, Progressive Federal filed with OTS its application for a voluntary supervisory conversion from a federally chartered mutual savings bank to a federally chartered stock savings bank and its simultaneous merger into Ozark Bank. The application for the conversion and merger was approved by OTS on

September 20, 1991.  Thereafter the merged bank operated as Progressive Ozark Federal Savings Bank.

## PROCEEDINGS BELOW AND GROUNDS FOR APPEAL

In September 1992, Romines (of Virginia) brought this diversity action against Progressive Ozark Bank (of Missouri) and Great-West (of Colorado and Canada) seeking a declaration that the termination of the Consulting Agreement was invalid and seeking recovery of annuity payments not made to Romines since March 1991 (now totalling in excess of $150,000).  After discovery, the parties filed cross motions for summary judgment.  The district court granted summary judgment for Progressive Ozark Bank on grounds that (1) the Consulting Agreement had automatically terminated by operation of law and (2) Romines had no rights under the Consulting Agreement which had vested prior to its termination.

On this appeal, Romines' primary challenges are to these two aspects of the district court's decision.  Romines argues that the district court was incorrect in holding that the Consulting Agreement had terminated by operation of law.  Romines contends that under the terms of the agreement and the controlling federal regulations only a formal decision by the Secretary of the Office of Thrift Supervision that the bank was insolvent would terminate the agreement and that such a formal finding by the Secretary himself was never issued.  Alternatively, Romines urges that even if the Consulting Agreement was lawfully terminated his rights to annuity payments thereunder were vested prior to the termination and thus could not be abrogated by the bank without breaching the agreement.

In addition, Romines raises two subsidiary arguments.  Romines contends that the district court committed reversible error by admitting into evidence internal, non-public documents of the OTS and FDIC.  Romines also contends that the district court erred in holding its separate claims against Great-West on the annuity contracts were moot.

We consider each of Romines' contentions in order.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo and under the same standard which governed the district court's decision. <u>Lenhardt v. Basic Inst. of Technology, Inc.</u>, 55 F.3d 377, 379 (8th Cir. 1995). The question is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Maitland v. University of Minnesota</u>, 43 F.3d 357, 360 (8th Cir. 1994).

## APPLICABLE FEDERAL STATUTE AND REGULATIONS

Federally chartered savings banks such as Progressive Federal are subject to an extensive scheme of federal regulation including the Home Owners' Loan Act of 1933, as amended, 12 U.S.C. §§ 1461-1468c, and regulations issued pursuant to the Act, 12 C.F.R. §§ 500-591.

Among the regulations promulgated pursuant to the Act applicable at the time the Consulting Agreement became effective in 1988 was the requirement that every federally insured savings bank include in each of its employment agreements the following:

> (b) <u>Required Provisions.</u> Each employment contract shall provide that:
>
> (5) <u>All obligations under the contract shall be terminated</u>, except to the extent determined that continuation of the contract is necessary for the continued operation of the association,
>
> (ii) <u>by the Federal Home Loan Bank Board</u>, at the time the Bank Board or its Principal Supervisory Agent (as defined in 12 U.S.C. § 561.35 Subchapter D) approves a supervisory merger to resolve problems related to operation of the association or <u>when the association is determined by the Board to be in an unsafe or unsound condition</u>. Any rights of the parties that have already vested, however, shall not be affected by such action.

12 C.F.R. § 563.39(b)(5)(ii) (emphasis added).  Paragraph seven of the Consulting Agreement incorporated the above language verbatim.

After the Consulting Agreement was entered, but before it was terminated by the board of directors, Congress enacted the Financial Institutions, Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub. L. No. 101-73, 103 Stat. 183, which substantially amended the Home Owners' Loan Act.  Among the changes brought by FIRREA was the replacement of the Federal Home Loan Bank Board by the Office of Thrift Supervision as the primary regulator of savings and loan associations and savings banks.  Section 563.39(b)(5)(ii) was therefore modified to read as follows:

> (b)  <u>Required Provisions.</u>  Each employment contract shall provide that:
>
> (5)  <u>All obligations under the contract shall be terminated</u>, except to the extent determined that continuation of the contract is necessary of [sic] the continued operation of the association
>
> (ii)  <u>By the Director or his or her designee</u>, at the time the Director or his or her designee approves a supervisory merger to resolve problems related to the operation of the association or <u>when the association is determined by the Director to be in an unsafe or unsound condition</u>.
>
> <u>Any rights of the parties that have already vested, however, shall not be affected by such action</u>.

12 C.F.R. § 563.39(b)(5)(ii) (emphasis added).  Thus, under the amended statute and implementing regulations, all employment contracts entered by savings and loans would still automatically terminate in the event the institution was found unsafe; however, responsibility for the determination was transferred to the Director of the new Office of Thrift Supervision.

Although the text of the Consulting Agreement included the language mandated by the <u>pre</u>-FIRREA version of § 563.39, both the appellants and the appellees have argued this appeal based on their interpretation of the <u>post</u>-FIRREA regulations.  We will therefore

assume (without deciding) for purposes of our discussion here that the amended statute and regulations apply.

**TERMINATION OF THE CONSULTING AGREEMENT BY OPERATION OF LAW**

Both appellants and appellees assume that the Consulting Agreement between Romines and Progressive Federal was an "employment contract" covered by Section 563.39 and we accept that assumption for purposes of this appeal. The parties dispute, however, the question whether the Consulting Agreement was automatically terminated by operation of law under Section 563.39.

Great-West and Progressive Ozark Bank contend, and the district court held, that Romines had no further right to collect under the Consulting Agreement once the Office of Thrift Supervision determined that Progressive Federal was unsafe and unsound. They argue that pursuant to Section 563.39 the Consulting Agreement terminated automatically upon the finding of unsafe and unsound condition and that Romines' right to payments under the Agreement also were terminated as a matter of law. We agree.

We do not believe that Romines' contrary arguments - that some formal hearing procedure was mandated by Section 563.39 and that a personal finding of unsafe and unsound condition by the Secretary of the Office of Thrift Supervision was necessary - are consistent with either the letter or spirit of the regulation.

The Home Owner's Loan Act which established the Office of Thrift Supervision granted broad authority to the Director of OTS to provide for the "examination, safe and sound operation, and regulation of savings associations [and savings banks]. 12 U.S.C. § 1463(a)(1). Similarly, the Act broadly authorized the Director to issue "such regulations as the Director determines to be appropriate to carry out the responsibilities" of OTS, 12 U.S.C. § 1463(a)(2), and to delegate "to any employee, representative, or agent any power of the Director," 12 U.S.C. § 1462a(h)(4)(a).

Among the regulations adopted by the Director to carry out

-8-

this broad authority was Section 563.39 providing for the termination of employment contracts. Section 563.39 was intended to afford federal regulators the flexibility to monitor and remedy abusive or excessive employment contracts entered into by institutions that later default or need regulatory assistance to survive. See 47 Fed. Reg. 17,471 (1982). In particular, Section 563.39 provides that employment contracts terminate automatically -and replacement agreements have to be approved by the regulators - upon default or a finding of unsafe and unsound condition. Section 563.39 mandates no particular form of proceeding or finding for the termination of such employment contracts but merely says that "all obligations under the contract shall be terminated . . . by the Director or his or her designee, . . . when the association is determined by the Director to be in an unsafe or unsound condition."

In this case, both Romines and the bank were put on notice as early as the fall 1990 audit reports and the December 1990 Consent Agreement that Progressive Federal was insolvent under OTS accounting guidelines and could not continue to be operated in its present form. The Office of Thrift Supervision then confirmed in the March 7, 1991 letter from OTS Assistant Director Townsend that the institution's financial condition was unsafe and unsound and that all employment contracts were accordingly terminated. Townsend indicated in the letter that alternate compensation arrangements could be established with Romines but that any such arrangements required the approval of the OTS. The Progressive Federal Board decided to terminate the Consulting Agreement but no alternate compensation arrangements were ever made.

At no point did Romines or Progressive Federal ever request any formal hearing on the institution's solvency or challenge any of the essential factual findings of the FDIC or OTS audits. Romines and Progressive Federal consistently dealt with Assistant Director Townsend and at no time challenged his authority to act on the Director's behalf. Indeed, in the December 1990 Consent Agreement, negotiated and signed by Townsend on behalf of OTS and

negotiated and signed by Romines on behalf of Progressive Federal, Progressive Federal acknowledged that it was insolvent and agreed to seek a merger partner in lieu of receivership or liquidation. Moreover, by signing the Consent Agreement Romines explicitly agreed to the Consent Agreement's recital of the authority of Townsend as the local OTS official authorized to review both expenditures in general and employment contracts in particular.

Based on these facts, we believe that there is no doubt that by the time payments to Romines under the Consulting Agreement were halted at the end of March 1991 there had been a determination by OTS communicated to Progressive Federal that it was in an unsafe and unsound condition and that Romines' employment contract was accordingly terminated as required by law.

Our conclusion is fully consistent with the decisions of other courts which have considered the termination of employment contracts under Section 563.39. In several similar cases involving employees of failed savings institutions, courts have ruled that employment contracts were automatically terminated when the bank or savings and loan was found to be in an unsafe and unsound condition or when a receiver was appointed.

In Modzelewski v. RTC, 14 F.3d 1374 (9th Cir. 1994), for example, the Ninth Circuit held that the Salary Continuation Agreements between a savings and loan and two officers were automatically terminated under Section 563.39 when the Resolution Trust Corporation took over the institution as receiver and that summary judgment on that issue was appropriate. Similarly, in Aronson v. RTC, 38 F.3d 1110 (9th Cir. 1994), the Ninth Circuit held that the district court was correct to dismiss the claim of a former savings bank officer for salary under an oral employment agreement, because the agreement was terminated under Section 563.39 when the RTC assumed control of the bank.

Numerous cases in the federal district courts have also followed this reasoning and held that employment contracts had

automatically terminated under Section 563.39. See, e.g., Crocker v. RTC, 839 F. Supp. 1291 (N.D. Ill. 1993) (claim of chairman of savings association for consulting fees under employment agreement rejected because contract automatically terminated under Section 563.39 when RTC became conservator); Cohen v. RTC, 193 U.S. Dist. LEXIS 7317 (Civ. No. 90-1065) (S.D. Cal. 1993) (retention bonus agreement with savings bank vice president automatically terminated under Section 563.39 based on OTS letter that institution was unsafe and unsound); Barnes v. RTC, 1992 U.S. Dist. LEXIS 1841 (Civ. No. 91-2011) (D. Kan. 1992) (employment contract of director of savings association division terminated under Section 563.39 when RTC became conservator).

The only case cited by Romines in support of his argument that the Consulting Agreement did not terminate by operation of law, FSLIC v. Quinn, 922 F.2d 1251 (6th Cir. 1991), is inapposite. In Quinn, thrift officials Quinn and Gannon were recruited by the FSLIC as receiver to manage a failing savings and loan association. Later, when efforts to save the troubled thrift were unsuccessful, it was sold to another institution and the employment contracts of Quinn and Gannon were terminated. The FSLIC then filed suit for declaratory and injunctive relief on the ground that it did not owe severance benefits to Quinn and Gannon under the employment contracts.

The Sixth Circuit noted that because the FSLIC had determined that the thrift was in "unsafe or unsound condition" any obligation of FSLIC under the contracts pursuant to Section 563.39 would ordinarily be deemed terminated. 922 F.2d at 1253. However, the court held that on the peculiar facts of the case an exception to automatic termination under Section 563.39 applied. The FSLIC had itself recruited and hired Quinn and Gannon to manage the thrift after it became unsafe and the FSLIC had also specifically negotiated with the officials to pay them severance benefits if their employment was terminated before the end of their contract. The Sixth Circuit found that these actions by the FSLIC amounted to an FSLIC determination that the services of the two managers were

-11-

necessary to keep the thrift afloat. 922 F.2d at 1253. Accordingly, the court held that under an exception in Section 563.39 "continuation of the contract [was] necessary [to] the continued operation of the institution," 12 C.F.R. § 563.39(b)(5), and the FSLIC was accordingly obligated to pay the severance benefits. 922 F.2d at 1256.

Quinn simply does not stand for the proposition asserted by Romines that his employment contract did not terminate when the OTS found that Progressive Federal was unsafe or unsound. It merely holds that in certain circumstances a separate exception in Section 563.39 may foreclose the argument that an employment contract was terminated if the regulatory agency has in effect determined that continuation of the contract was necessary. We note that there is absolutely no contention by appellants here that this exception in Section 563.39 applies to Romines. Moreover, there are no facts to suggest that OTS, Progressive Federal or anyone else considered Romines' continued services under the Consulting Agreement to be necessary to the continued operation of the savings bank.

Similarly, Quinn does not stand for the additional proposition, asserted by Romines, that the Office of Thrift Supervision was obligated to hold a formal hearing on Progressive Federal's insolvency and that the OTS Director was required to issue a formal order that the savings bank was in an unsafe or unsound condition. Indeed, Quinn supports the opposite conclusion: that no particular form of agency action is required. In Quinn, as in this case, the regulatory agency and the troubled thrift entered into a consent agreement in lieu of formal proceedings. 922 F.2d at 1256 n.5. In Quinn, as in this case, the agency's course of administrative actions - even absent a formal agency proceeding on the bank's unsafe condition - was held by the Sixth Circuit to be "equivalent to a finding of 'unsafe and unsound' conditions." 922 F.2d at 1245.

In sum, we find that based on the undisputed facts the Consulting Agreement was clearly terminated by operation of law and

-12-

we believe that the district court was correct to grant summary judgment on this issue. Romines' contention that termination of the Consulting Agreement required some additional action by the Director of OTS was incorrect as a matter of law. Accordingly, no disputed material issue of fact remained and summary judgment was appropriate.

## NO RIGHTS TO PAYMENT VESTED PRIOR TO TERMINATION

Romines' alternative argument for reversal - that even if the Consulting Agreement was properly terminated by operation of law his rights to payment thereunder were vested prior to termination -is also unpersuasive.

Section 563.39 provides that although a savings institution is determined to be in unsafe or unsound condition and accordingly employment contracts covered by Section 563.39 are terminated, "any rights of the parties that have already vested . . . shall not be affected by such action." 12 C.F.R. § 563.39(b)(5). There is no definition of what is a "vested" right under either Section 563.39 or its authorizing legislation. Every court which has considered the issue, however, has held that a right is vested if it is unconditional, i.e., the employee holding the right is entitled to claim immediate payment. See, e.g., Aronson, 38 F.3d at 1113; Modzelewski, 14 F.3d at 1378. This definition furthers the statute's policy of distinguishing between contract rights in the nature of pension or retirement benefits which have already accrued and should not be affected by termination of the contract on one hand, and contract rights for payment for services not yet rendered for which no payment should be owed on the other hand.

In this case we believe there is little doubt that the payments to be made to Romines under the Consulting Agreement were payments in return for services he was to render. He was entitled to be paid for those management services he had already provided until the end of March 1991. However, he had no unconditional right to receive payment for consulting services which he never provided.

-13-

Romines raises the additional claim that because the Consulting Agreement provided that he would not be terminated "without cause" he had a vested right to receive payments under the agreement unless some cause for termination was put forward. This is incorrect as a matter of law. The terms of the Consulting Agreement specifically incorporated the language of Section 563.39 (5) providing that the agreement could be automatically terminated by operation of law as well as for cause.

Numerous courts have held that a "without cause" provision does not preclude termination of the contract by operation of law under Section 563.39. In Rush v. FDIC, 747 F. Supp. 575 (N.D. Cal. 1990), for example, the court held that Rush had no vested right to payment under an employment contract which guaranteed payment of severance benefits equalling one year's salary of $105,000 if he was terminated without cause. The court held that the right to the severance benefit vested only upon the occurrence of the condition: termination without cause. Because the employee's contract terminated by operation of law (when the bank was declared insolvent) before the condition was met, his right remained merely conditional and not vested. Accord, Aronson v. RTC, 38 F.3d 1110 (9th Cir. 1994) (right to pension benefit not vested if employment contract terminated by operation of law before employee reached retirement age); Modzelewski v. RTC, 14 F.3d 1374 (9th Cir. 1994) (same); Crocker v. RTC, 839 F. Supp. 1291 (N.D. Ill. 1993) (right of former thrift chairman to consulting fee not vested if employment contract terminated by operation of law prior to termination without cause).

Romines' argument that Modzelewski and Aronson support his contention that his right to payment under the Consulting Agreement had vested prior to its termination under Section 563.39 is misplaced. Romines contends that once the agreement was entered into and became effective in 1988 he had an immediate right to payment. Romines' argument, however, seriously misstates the holding of the cited cases. In both Modzelewski and Aronson the Ninth Circuit made clear that the right to payment does not vest

merely upon the signing of an employment contract but only when all conditions to payment are satisfied. In the case of retirement benefits, Modzelewski and Aronson hold that the right to payment of retirement benefits vests only when the employee reaches the required retirement age.

The Consulting Agreement between Romines and the bank was not a pension or retirement plan for which he had immediate right to claim payment upon reaching a certain age. It was a contract for Romines to provide management services to the bank in return for monthly payments. Romines' right to payment of the entire total amount of consulting fees did not vest upon the signing of the Consulting Agreement but accrued monthly as he provided the services contracted for. When the Consulting Agreement was terminated by operation of law under Section 563.39, Romines lost the right to claim payment for consulting services he would have provided in the future had the agreement not been terminated.

We believe that this holding is consistent with the policy behind Section 563.39 of allowing the OTS the flexibility it needs to deal with troubled savings institutions while at the same time ensuring payment to employees of salary and benefits already earned. As other courts have noted, Section 563.39 "is necessary to relieve a troubled or insolvent savings and loan institution from burdensome obligations such as substantial contracts for severance pay. The interpretation that plaintiff urges – that severance agreements vest upon formation – denies the [agency] the flexibility it required to manage unsound savings and loan associations." Rush v. FDIC, 747 F. Supp. 575, 578 (N.D. Cal. 1990). Accord, Rice v. RTC, 785 F. Supp. 1385, 1391 (D. Ariz. 1992), rev'd on other grounds, Modzelewski v. RTC, 14 F.3d 1374 (9th Cir. 1994).

Accordingly, we follow other federal courts that have considered this issue and hold that on the undisputed facts Romines did not have a vested right to payment under the Consulting Agreement which survived the termination of the contract under

563.39.  The district court properly granted summary judgment for appellees on this issue.

## THE DISTRICT COURT DID NOT ERR BY ADMITTING INTO EVIDENCE FDIC AND OTS DOCUMENTS

Romines contends that the district court committed reversible error by admitting into evidence the reports of the OTS and FDIC audits which found Progressive Federal was insolvent as well as the May 1991 OTS letter confirming that Progressive Federal was in unsafe and unsound condition.  Romines' principal contention appears to be that these documents were irrelevant as a matter of law because they were not documents of public record.

We reject this claim.  The audit reports as well as the OTS letter were clearly relevant to determining the central issue raised by Romines' lawsuit, the question whether Progressive Federal's employment contracts were terminated by operation of law because the bank was found to be in unsafe and unsound condition. The district court did not err by admitting these documents into evidence or relying in part upon them in reaching its decision.

## ROMINES HAS NO INDEPENDENT RIGHT TO RECOVER FROM GREAT WEST UNDER THE ANNUITY CONTRACTS

We also reject Romines' final claim: that even if Progressive Ozark is not obligated to him for the amount of consulting fees he would have earned under the Consulting Agreement he is nonetheless entitled to recover that same amount from Great-West.  Romines contends that, because he was designated the payee on the annuities issued by Great-West and his family members were designated the beneficiaries in the event of his death, their right to payment under the annuities was irrevocable.  Thus, Romines argues that Great-West had no right to make payments under the annuities to Progressive Federal (and after the merger to Progressive Ozark) rather than to Romines once the Consulting Agreement was terminated.

Nothing in the terms of the annuity contracts supports the suggestion that the payee designations were irrevocable.  Indeed,

because the contracts clearly stated that the bank was the owner of the annuity contracts we believe the implicit assumption was that as owner the bank could also change the payee. Romines has cited no case law or other authority to support his claim that the payee and beneficiaries should be assumed to be irrevocably designated. Moreover, Romines has offered no basis at all in public policy for allowing him to recover from Great-West what we have held he is not entitled to recover from Progressive Ozark.

Although the district court granted Progressive Ozark's motion for summary judgment, it denied the motion of Great-West as moot. We believe that the logic of the district court's decision was that if Romines had no right to payment under the Consulting Agreement with Progressive Ozark, then by definition he had no right to payment under the annuity contracts which were entered solely to fund the consulting fee payments. Thus, we conclude that the district court implicitly and correctly held that the termination of the Consulting Agreement also terminated Romines' right to claim payment from Great-West under the annuity contracts entered into to fund the consulting fee payments.

For the reasons stated above, the judgment of the district court is in all respects affirmed.

A true copy.

        Attest:

                CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-17-